Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2018 08:10 AM CDT

State of Nebraska, appellee, v.
Amadeus L. Leroux, appellant.
___ N.W.2d ___

Filed July 10, 2018.    No. A-17-1160.

1. **Criminal Law: Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Courts: Juvenile Courts: Evidence.** Under Neb. Rev. Stat. § 29-1816(3)(a) (Reissue 2016), after considering the evidence and the criteria set forth in Neb. Rev. Stat. § 43-276 (Reissue 2016), the court shall transfer the case to juvenile court unless a sound basis exists for retaining the case in county court or district court.
4. **Courts: Juvenile Courts: Jurisdiction: Proof.** In a motion to transfer to juvenile court, the burden of proving a sound basis for retaining jurisdiction in county court or district court lies with the State.
5. **Courts: Juvenile Courts: Jurisdiction.** In order to retain proceedings in criminal court, the court need not resolve every statutory factor in favor of transfer against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.
6. **Courts: Juvenile Courts: Jurisdiction: Evidence.** When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court.

Appeal from the District Court for Keith County: Donald E. Rowlands, Judge. Affirmed.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., and Daniel R. Stockmann, of Stockmann Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

Moore, Chief Judge, and Bishop and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Amadeus L. Leroux, age 15 at the time of his charged offenses, appeals from the Keith County District Court's order denying his motion to transfer his pending criminal proceeding to the juvenile court. Although more of the statutory factors set forth in Neb. Rev. Stat. § 43-276(1) (Reissue 2016) favored transferring the case than those retaining it, the statutory scheme does not provide a mathematical approach to these decisions. Further, the statutory factors are not weighted, and the trial court does not need to resolve every factor against the juvenile in deciding whether to retain the case in adult court. Finally, even if this court found the factors tipped more favorably for granting the transfer, we are constrained by our standard of review. An appellate court may determine only if the trial court abused its discretion by denying a request to transfer the case to juvenile court, and under this standard of review, we must affirm.

## II. BACKGROUND

A complaint was filed in the county court for Keith County by the Keith County Attorney on March 30, 2017. The complaint alleged that on or about March 28, Leroux (date of birth September 2001) intentionally committed murder in the second degree, but without premeditation, a Class IB felony, and

intentionally used a knife, or other deadly weapon, to commit a felony, a Class II felony. Leroux waived a preliminary hearing, and the case was bound over to the district court on May 8. An amended information was filed, and on October 9, Leroux filed a motion to transfer jurisdiction to the juvenile court. A hearing on Leroux's motion took place on October 18; a summary of the evidence adduced at that hearing follows.

## 1. Law Enforcement
### Witness for State

Nebraska State Patrol Trooper Peter Rutherford testified that he was on duty on March 28, 2017, and was called to investigate the death of John Fratis, who he believed was 25 years old. Raylynn Garcia referred to Fratis as "her brother," but they are not biological siblings—they were raised together. Trooper Rutherford believed Fratis had moved in with Garcia at a home on "North Spruce" in Ogallala, Nebraska, in December or January, "[s]o several months leading up" to the incident. Larry Derrera also grew up in the same home as Garcia, and they "have since moved in together and have two children in common."

Garcia and Derrera had gone to Colorado for a family event, and on their way back, they brought Leroux "to come back to Ogallala to spend some time in the area and see the lake." Once they arrived back in Ogallala, Garcia, Derrera, Leroux, Fratis, and the two minor children went to the home. Derrera, Leroux, and Fratis were drinking alcohol, and Garcia had smoked a marijuana "blunt" with Fratis. At 2 a.m., Garcia, Derrera, and the two children went to bed, while Leroux and Fratis remained in the living room. A short time later, Garcia and Derrera were awakened to the sound of fighting; Derrera saw Leroux and Fratis "kind of wrestling around with each other in conflict." Derrera separated them and told them to "cool down [and] go their separate ways." Derrera returned to bed. He later heard another commotion and went out to see Leroux and Fratis "in what he believed to be the tailend [sic] of a fight." Furniture

was in disarray, a fish tank was knocked over, and a television had been knocked over and broken. Derrera again told Leroux and Fratis to "chill out," and he separated the two. (Trooper Rutherford explained that this had been taking place over several hours.) Fratis went outside to smoke, and Leroux headed to the bathroom just off the kitchen.

Derrera returned to bed, but Garcia, who had also been awakened from the commotion, assisted with the cleanup. Garcia was "fed up . . . with the stress and fighting," so she started to get the two children changed into new clothes to put them in the car. When Garcia was in the laundry room area just off the kitchen, she heard another commotion coming from the main living area. When she rounded the corner, she saw Leroux standing next to Fratis with a knife in his hand. Garcia saw Fratis grasping his side, and "[h]e made the exclamation, What the Fuck, did you [just] stab . . . me?"

Garcia told Trooper Rutherford that she "freaked out," grabbed the knife, and threw it into the sink. She grabbed the two children and took them out to the car, then returned to the house and retrieved her marijuana in her purse. She then drove away from the residence. Meanwhile, Derrera came out of the bedroom and saw Fratis bleeding profusely, with blood coming from his mouth and from his side. Derrera helped Fratis out of the living room and on to the front porch. At 8:15 a.m., a vehicle was flagged down and the driver, who was a dentist, transported Fratis to the local hospital.

When processing the scene, footprints were noted leaving the residence going west along the alley just north of the residence. A few blocks away from the residence, Leroux flagged down a passing motorist, a local Ogallala resident. Leroux told the driver he had been in a fight with "six guys . . . over a video game earlier that morning." Leroux asked for a ride to a gas station. During the ride, the driver noted that Leroux had a "knot" over his left eye and some deep scratches on his left hand, which corroborated Leroux's story about the fight. Later that day, the driver "ran into" the dentist, who told him about

picking Fratis up and taking him to the hospital. The driver then thought about Leroux who said he had been in a fight, so he went to the crime scene and met with Trooper Rutherford there. That prompted Trooper Rutherford to call the gas station where the driver had dropped off Leroux, and the gas station clerk knew who Trooper Rutherford was describing. The clerk said "this kid came in" and asked to borrow the clerk's telephone so he could call his mother. The clerk let him make the call, and a few minutes later, "he jumped in a car and left."

Trooper Rutherford traced the call made by Leroux to Leroux's mother, and he also retrieved surveillance video from the gas station. The video showed Leroux getting into a vehicle with a window broken out on the driver's side. The video showed Leroux, who was wearing a white T-shirt, jeans, and white shoes. According to Trooper Rutherford, the shirt in the video "did not appear to be covered in blood." Based on information from local law enforcement, Trooper Rutherford knew the vehicle was driven by Garcia. Garcia claimed she called Leroux's mother to let her know that Leroux had been in a fight with Fratis and that Fratis was injured. Leroux's mother instructed Garcia to look for Leroux, and while Garcia was driving around looking for him, Leroux's mother called to tell her Leroux was at the gas station and to pick him up and bring him to her in Colorado. When Garcia picked Leroux up at the gas station, Leroux "proceeded to the rear of the cargo area and covered himself up with blankets." Garcia drove to Sterling, Colorado, with Leroux and the two children.

The autopsy of Fratis showed approximately six stab wounds: one on the front of his torso, three on the left side of his torso, and two on his back. Several of the stab wounds were direct and deep; Fratis' left lung was struck once, and his heart was struck twice.

Under cross-examination by Leroux's counsel, Trooper Rutherford acknowledged that there was a prior assault between Derrera and Fratis. Trooper Rutherford interviewed

Garcia twice following Fratis' death, and he agreed she lied to law enforcement several times on substantial things. Garcia acknowledged in her second interview that she had "done cocaine" in the 24 hours before Fratis' death. Derrera had been interviewed three times and lied to law enforcement on multiple occasions. Trooper Rutherford said Derrera and Garcia had been charged with child abuse related to the presence of drugs in the home and the violent events that occurred with the two children present the day of Fratis' death.

## 2. Probation Officer
### Witness for State

Amber Pierce, a juvenile specialized probation officer, testified that she supervises only juvenile cases. Pierce met with Leroux because Leroux was under the age of 19 and there was a warrant, so probation was responsible for his placement. Pierce discussed the Youth Rehabilitation and Treatment Center (YRTC) in Kearney, Nebraska, noting there was no one currently in the YRTC with a murder conviction. There are no special programs or services specific to a murder conviction at the YRTC. Pierce testified that the average time a juvenile spends in the YRTC is 7 to 9 months and that after such period, the juvenile would be released back to the community. The YRTC does offer therapy services, which would be equivalent to outpatient services.

Pierce also discussed the Nebraska Correctional Youth Facility (NCYF), which is under the Department of Correctional Services and is a facility specific for juveniles charged and convicted as adults. The age range of individuals jailed there is 14 years to 21 years 10 months. Pierce testified that the services available at the NCYF are more substantial than those at the YRTC. She said it was her understanding that if Leroux was convicted as an adult, he would automatically be placed at the NCYF so long as he is under the age of 19. Pierce also noted that if a juvenile came to Nebraska from Colorado, and as a result of a predisposition investigation (which she said is

similar to a presentence investigation for an adult), it was recommended the juvenile go to the YRTC, the juvenile would not be transferred back to Colorado, but would instead complete the YRTC term in Nebraska.

On cross-examination, Pierce acknowledged that it is detrimental for a juvenile to be exposed to trauma and to not receive treatment for that trauma. Pierce did not know what the provisions are for "trauma informed care" at the NCYF, nor did she know the ratio of mental health providers to juveniles at the NCYF. Pierce knew there was a psychologist and two mental health practitioners on staff; she did not know if they had additional staff. Pierce said she did not know how many "kids [were] at NCYF with that one psychologist and two [mental health practitioners]," and when offered an estimate of several hundred, Pierce said she did not know. After redirect examination of Pierce, the State rested.

### 3. Defense Witness
#### Tessa Frederick

Tessa Frederick is the assistant site director at a Boys & Girls Club in Denver, Colorado, of which Leroux was a member. The club provides afterschool programs in underserved communities, offering "high yield activities in healthy lifestyles, character leadership and academic success, as well as providing community support, supporting the schools around, providing dinner, those kinds of things." Children are eligible to participate from age 6 through 18. Leroux participated in service learning projects, such as raising funds and supplies for the victims of a forest fire, and more recently, the club served food to the homeless at a Denver rescue facility. Children can be suspended or expelled from the club if they bring a weapon or drug, if they fight, or if they are disrespectful to staff.

According to Frederick, Leroux started coming to the club, along with his older brother and younger sisters, when he was 8 or 9 years old. Leroux was a "very shy kid" and would need

to be coaxed to participate in activities. He played on sports teams, was a member of a leadership group, and participated in a "computer lab." Other than for a period after the death of Leroux's father, Leroux was in attendance at the club "[b]asically every day." Frederick said that Leroux's mother "wanted a place for her kids to go after school while she worked that would be safe and purposeful."

Frederick said that she got to know Leroux and his family well and that she would "[n]ever" describe his personality as aggressive or forceful. Rather, she described Leroux as "so quiet" and said that it took years before Leroux trusted Frederick enough to open up to her. However, Leroux "was an active listener" and "was engaged." "[W]hen it came to speaking out or doing a little bit more as far as the activities go, he was just a spectator," she said. Leroux was "a very strong reader," so Frederick would sometimes have him help the younger members in the reading program. In terms of maturity, Leroux behaved "within his age."

Frederick testified she was not aware of Leroux doing any traveling other than with the club. She described Leroux as a "[v]ery normal, very average, just a normal 15-year-old." To her knowledge, Leroux never had a violent outburst or any type of problem interacting socially in the club, nor had he ever been suspended or thrown out of the club. The club is aware of Leroux's charges, and Frederick was not aware of any problems with the staff or other children as a result. Leroux has continued to go to the club where he does his homework and "hangs out in the peace and quiet of the teen room where there is always lots to do there, whether it's a game or activity [that] is going on, cooking club, that kind of thing and occasionally staying for a teen night."

### 4. Defense Witness
### Dr. Joseph Peraino

Dr. Joseph Peraino, from Denver, has been a clinical psychologist for over 30 years and is licensed in Colorado. He

spends about half of his time in office practice, with the other half spent in forensic work. About 60 percent of his time is spent with adults, and 40 percent with teenagers. He has been doing psychological assessments since 1978.

Dr. Peraino testified that literature indicates that for juveniles, trauma "actually affects their psychological, and to some degree depending on the severity, their brain development." Noting that "trauma [is] a distraction for anybody," Dr. Peraino said it has more impact early in life because a child does not have as much life experience. Dr. Peraino went on to state:

> [S]ome children and teens will withdraw and become depressed. Others will become highly anxious. Others will not know what to do with their anxiety and essentially act out, kind of don't think clearly, and they act impulsively and get in trouble. At some level it shakes their foundation, their view of the world, and makes them not trust others.

Dr. Peraino said that psychotherapy can be helpful and that medication can help in extreme cases if a person is severely anxious or depressed. Speaking more generally about brain development, Dr. Peraino said:

> The brain continues to develop until around 25 years old. And the process of the brain maturing goes from kind of the brain stem to the back of the brain all the way to the front of the brain. So the last thing that develops is the prefrontal cortex and that is where the center of judgment is, the executive function is for individuals.
>
> And even though you have — at a midteen level you might find somebody who is pretty bright and kind of knows the rules, they don't necessarily have the judgment to go along with that.
>
> So we know that, for example, the teen accident rate is very high compared to adults. They know all the rules just as well as the adults do. But they just don't exercise the judgment because that part of the brain hasn't developed very well yet.

Dr. Peraino said that based on "longitudinal studies . . . a small percentage of teenagers who commit crimes actually continue to do so in adulthood. So in that sense for the majority of teenagers, punishment should be secondary to treatment or rehabilitation." And if they are incarcerated instead, "they don't get the chance to experience the many aspects of the world that they can learn" and "[t]here are extreme limits to the aspects of life that can help them mature, grow, and psychologically develop."

As to Leroux specifically, Dr. Peraino had done a psychological assessment of him over a 2-day period at the request of Leroux's counsel. That assessment included interviews with Leroux and his mother, both jointly and separately. In addition to conducting a juvenile risk assessment, Dr. Peraino also administered psychological tests, including tests related to intellect and academic skills, emotional intelligence, and personality assessments. In this type of evaluation, Dr. Peraino is looking for personality, maturity level, learning disabilities, intelligence level, how the teenager processes information, and whether recommendations of a psychological nature are needed.

Leroux scored 86 on the "IQ tests overall," which "falls within the below average range." Leroux's "processing speed," or "how quickly one intakes information and outputs as a result," was "well below average, at the fifth percentile given his age." He also scored below average in verbal comprehension, while his perceptional reasoning and working memory were within the average range. Leroux scored "significantly higher on the academic testing, reading, word reading, sentence comprehension, spelling . . . even math calculation problems, computation was higher than what his IQ score would have indicated." According to Dr. Peraino, that "means that he learns well. That probably the IQ score was suppressed because of slow processing speed and somewhat verbal comprehension as well." Dr. Peraino stated Leroux's reading was at the 12th grade level, spelling was at the 11th grade level, and math was

at the 7th grade level; he is "[c]ognitively intact," but "probably functioning a little below an average 16-year-old because of the lower IQ score, 14, 15, in that range."

Dr. Peraino concluded Leroux has the capability to learn, but has some difficulty processing information quickly; Leroux is "somebody that needs time to kind of reflect and think about what's going on." Dr. Peraino described Leroux as "calm . . . [f]riendly, engaging," and he noted that Leroux "[k]ept calling me bro." Dr. Peraino was struck by Leroux's trauma exposure or negative events. "He has seen a video of his father being shot and killed, being in a car accident, being attacked by dogs, . . . a couple of uncles committing suicide[.]" Leroux indicated to Dr. Peraino that the trauma has affected him; Dr. Peraino thought it caused Leroux to "maintain distance from people, to kind of disengage from the environment."

Leroux was given a standard personality scale called the Millon Adolescent Clinical Inventory, as well as an "emotional IQ scale" and the "Rorschach" and "Thematic Apperception Test." Dr. Peraino testified that Leroux's overall emotional IQ "is average compared to teens his age," but that "[h]e was elevated on a scale called stress management." This showed that while Leroux perceives himself as being able to handle stress, "when it comes down to it, he has difficulty, more difficulty than the average 16- to 18-year-old male in actually coping with that stress." The emotional IQ tests also showed Leroux has some difficulty establishing relationships; he scored "a little low on his ability to make connections with other people and maintain them." In personality testing, Leroux scored high in categories of "[s]ubmissive, [d]ramatizing, [e]gotistic, and [c]onforming." He scored "pretty low — or average compared to other teens on unruliness and being oppositional." He scored "fairly low on being forceful, being dominating, being aggressive, that kind of thing." Leroux scored fairly low on substance abuse proneness, and Dr. Peraino saw no evidence of psychotic thinking in his assessment of Leroux. "So what you've got is a picture of an individual who goes with the

flow, who is submissive, who is passive. He's kind of dependent, gives into other people usually. Coupled with sort of maybe elevated, overconfident sense of self."

Dr. Peraino also discussed a violence risk assessment, which is an evidence-based test that contains a scale of 24 risk factors research has found to be predictive of whether a juvenile will reoffend. Leroux "scored relatively low on risk for reoffense. 15 of those 24 items or factors were in the low range." According to Dr. Peraino, these factors included:

> Anger management problems, peer rejection, lack of personal social support, having attitudes of violence, growing up or living in a disorganized crime filled community, a history of violence, a history of self-harm, exposure to violence in the home, early initiation of violence, caretaker disruption in life or people that go to foster, poor parental management, substance abuse difficulties, empathy, and childhood history of mental treatment. Those were all low.

Leroux scored "moderate" for

> history of nonviolent offending, past supervision intervention failures. He admitted he failed a drug test when he was on probation. Somewhat risk taking and impulsive, low interest in school, parent criminality. His father was in prison. Period of delinquency, that was moderate because he was hanging out with someone that stole a car, and stress and poor coping.

Dr. Peraino rated Leroux "high" on two risk factors: "having ADHD and poor school achievement."

The violence risk assessment also includes "[p]rotective factors," which "are things that you would kind of defend against a person acting out in a criminal way or unlawful way. And those factors often include having connections with people, having strong bonds." Dr. Peraino testified that Leroux "had strong bonds with his family . . . strong social support" and that he is "currently committed to school and work." Dr. Peraino said that Leroux "has a positive attitude towards

intervention," which "means he accepts help. He's willing to accept help. He's willing to accept guidance. He will follow the advice of others." He agreed these are influential areas that help to reduce the risk of recidivism.

Dr. Peraino diagnosed Leroux with attention deficit disorder and post-traumatic stress disorder. The "cardinal characterization of somebody" with attention deficit disorder includes "inattention, impulsivity, and hyperactivity, . . . a lot of mood variability as well. But those are the three main ones." Leroux was placed on medication in 2014 "to see if psychostimulant medication would help him. And medication is the first line of treatment for [attention deficit disorder] despite what we all might hear."

As for the diagnosis of post-traumatic stress disorder, Dr. Peraino said the appropriate treatment is psychotherapy "to try to work through the traumas and put it in perspective." Medication can be useful depending on whether anxiety and depression symptoms are associated with the post-traumatic stress disorder. Dr. Peraino testified that if Leroux received appropriate treatment, his prognosis in terms of psychological development "would be great." Whereas, if he was put into a correctional setting, "given our discussion previously about his vulnerability, submissiveness, dependency, . . . he would be vulnerable to learning things that are antisocial in nature. And that would not be good for his long-term adult functioning."

In addition to his testimony, a written report prepared by Dr. Peraino was received over the State's objection. We note that in his "Conclusions and Recommendations," Dr. Peraino indicated that Leroux's "underdeveloped psychological development falls primarily in emotional areas. He appears to be a good learner but has difficulty managing his emotions and relationships." Noting that Leroux has responded well in a structured setting such as probation, Dr. Peraino said this means that Leroux "would very likely be responsive to treatment. He will need to experience a few years of a healthy environment to re-socialize him." The report further states

that Leroux "is at low risk for criminal recidivism based on a well-validated measure or risk assessment" and that "[d]ue to his positive response to probation, he would do well in a community placement." However, upon questioning by the State at the hearing, Dr. Peraino acknowledged that none of the information used in his evaluation included any information related to second degree murder and "those events."

### 5. Defense Witness
#### Jenifer Stinson

Jenifer Stinson, a criminal defense attorney from Denver who specializes in juvenile defense (specifically youth charged in adult court), testified about processes and assessments used in Colorado when dealing with juvenile offenders, as well as services available for treatment of such offenders. The gist of her testimony, it appears, is to support the notion that if Leroux's case was handled in juvenile court, there was a possibility that after adjudication the case could be transferred to Colorado's youth services division, which continues to provide services for a juvenile who has been adjudicated and placed within the system until age 21. Stinson also discussed a 2013 study which found that youth prosecuted in the adult system instead of the juvenile system were 34 percent more likely to recidivate.

Stinson and/or her law firm partner have been working with Leroux's family for the past couple of years; Stinson was representing Leroux in Colorado proceedings. Stinson discussed Leroux's 2016 adjudication in Colorado where he pled guilty to obstructing a peace officer, a "Class 2 Misdemeanor." He was sentenced to probation. When the situation in Nebraska arose, Stinson ultimately had Leroux and his mother meet her in court in Denver to get him into custody, and she described Leroux's demeanor as "very quiet," "very calm," and "almost stoic looking." She clarified that it was not that he was not taking matters seriously, but it was "more like taking a really deep breath before doing something that's really hard."

Stinson testified about the standard terms and conditions of juvenile probation in Colorado, which included being law abiding, attending school, having no school discipline problems, and being subject to alcohol and drug testing at any time. Stinson said that within the last month or two, Leroux's probation officer had stopped urine testing for Leroux because he had been compliant for a significant period of time. A Colorado warrant was filed due to Leroux's failure to comply with probation (leaving jurisdiction without permission), and then a motion to revoke probation was filed.

Leroux's Colorado case is being held in abeyance pending the disposition of the Nebraska case. Meanwhile, Leroux has been living at home with his mother, attending school online, and attending Boys & Girls Club. Stinson noted that since Leroux has been charged in Nebraska, there has been no change to the terms of his Colorado probation. And even though probation has the ability to use on Leroux an "ankle monitor, either electric home monitoring [or] GPS tracking," the district attorney had not asked for that.

### 6. DISTRICT COURT'S ORDER DENYING TRANSFER TO JUVENILE COURT

On October 27, 2017, the district court entered an order denying the motion to transfer the case to juvenile court. The court acknowledged that § 43-276 requires the court to consider 15 factors in making its decision and that the law requires the case be transferred to juvenile court unless a sound basis exists for retaining the case in district court. The court noted that murder in the second degree is a Class IB felony which carries a maximum sentence of life imprisonment and a minimum sentence of 20 years' imprisonment; the use of a deadly weapon to commit a felony is a Class II felony, which carries a maximum sentence of 50 years' imprisonment, with a minimum sentence of 1 year's imprisonment. If convicted of the deadly weapon charge, any sentence for that conviction must be served consecutively to the other conviction. The court's

discussion of the 15 factors contained in § 43-276 is set forth in the analysis section of this opinion. In its summary, the district court stated:

> [W]hile a number of factors set forth above favor treating [Leroux] with psychotherapy and medication in a juvenile facility, which would be of obvious benefit to [Leroux], the serious nature of the charges which allege that [Leroux] killed [Fratis] intentionally, but without premeditation, and with a deadly weapon, require this Court to conclude after balancing all of the factors and findings set forth above, that the safety of the public, and the necessity of confining [Leroux] to a secured facility well beyond the age of 19 years, will be required if he is convicted in this case. A sound basis thus exists for retaining this case in district court and trying [Leroux] as an adult. Accordingly, the Motion to Transfer to Juvenile Court . . . should be and the same is hereby denied.

The district court did reduce Leroux's bond to "$50,000 cash," stating that there was no suggestion Leroux had committed any criminal offenses while out on bond and that he had appeared for all scheduled hearings. It was noted that reducing Leroux's bond would allow him to continue to employ private counsel. Finally, the court indicated that if no appeal was filed within 10 days, Leroux and his counsel were to appear on December 8, 2017, for a status hearing, during which the case would be set for jury trial.

On November 6, 2017, Leroux appealed the October 27 order denying his request to be transferred to the juvenile court.

### III. ASSIGNMENT OF ERROR

Leroux assigns the district court erred by denying his motion to transfer his case to juvenile court.

### IV. STANDARD OF REVIEW

[1,2] A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d

363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, Neb. Rev. Stat. § 29-1816(3)(c) (Supp. 2017) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal" and that "[u]pon entry of an order, any party may appeal to the Court of Appeals within ten days." This statutory amendment providing for interlocutory appeals became effective August 24, 2017. Leroux has properly perfected his appeal from the district court's denial of his motion to transfer his criminal proceeding to the juvenile court.

### 2. Motion to Transfer
### to Juvenile Court

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against such juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Leroux put him within this category of juvenile offenders.

[3,4] In the instant case, when Leroux moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which requires consideration of the following factors set forth in § 43-276(1):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the

alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at a hearing on a motion to transfer from county or district court to the juvenile court. See § 29-1816(3)(a). Under § 29-1816(3)(a), after the court considers the evidence in light of the § 43-276(1) factors, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court. See *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). The burden of proving a sound basis for retention lies with the State. *Id.*

[5] As the Nebraska Supreme Court has explained, "In order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted

factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* at 582, 909 N.W.2d at 371. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.*

Leroux argues that the State failed to meet its burden and says that the focus of the district court should have been the "[p]rospects and need for rehabilitation" rather than the presumption that Leroux committed murder. Brief for appellant at 20. Leroux quotes substantially from *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), to explain the physical, mental, and emotional distinctions between juvenile and adult offenders. *Roper* addresses the "lesser culpability" of a juvenile offender and notes that "[w]hether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult." 453 U.S. at 571.

Leroux claims the State did not address the scientific and sociological studies discussed by Dr. Peraino that "prove the differences between adolescent juveniles and adults." Brief for appellant at 21. Leroux also contends the arguments in favor of retaining the case in district court, which are based on alleged community outrage and a need for retribution, should be disregarded.

We disagree with Leroux that the district court's reasons for retaining jurisdiction were based on community outrage and the need for retribution. Although we view some of the transfer factors differently than the district court, as explained later, the district court has the discretion to determine whether certain factors outweigh others, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. Instead, all factors must be considered by the court, and after considering all those factors, the court shall transfer the case to juvenile court unless a sound basis exists for retaining it. See § 29-1816(3)(a). In this case, the court

determined a sound basis to retain jurisdiction was supported by the evidence when considering the § 43-276(1) factors. Accordingly, we set forth the court's findings as to each of those factors.

### 3. Juvenile Transfer Factors

The district court made findings as to each of the 15 factors contained in § 43-276(1), which under § 29-1816(3)(a) "shall be considered" at a hearing. We first summarize the factors the district court concluded favored retaining jurisdiction, followed by the factors which favored transferring the case to juvenile court, and then the remaining factors which were either inapplicable to this case or could not be decided. We also summarize Leroux's and the State's arguments as to these factors.

### (a) Factors Favoring Retention in District Court

The district court found four of the factors set forth in § 43-276(1) favored retaining jurisdiction in the district court, namely: (a) the type of treatment Leroux would most likely be amenable to, (b) evidence of violence, (g) consideration of public safety, and (i) whether Leroux's best interests and the security of the public may require that Leroux continue in secure detention or under supervision for a period extending beyond his minority and, if so, the available alternatives best suited to this purpose.

The court concluded that if convicted, Leroux would most likely be amenable to treatment at the NCYF rather than the YRTC. It explained that the NCYF is a male correctional facility designed for youthful offenders adjudicated as adults who range in age from early adolescence to 21 years 10 months. The court found:

> NCYF offers anger management programs, clinical treatment for depression, a high school for individuals under 18 who have not graduated from high school, as well as college classes and various sports programs . . . . NCYF

is a secured facility. In contrast, YRTC is a non-secured facility which may house juvenile offenders until they reach 19 years of age, at which time the juvenile offender must be released from custody.

The court also expressed concern that according to the juvenile probation officer's testimony, "no person is now or ever has been committed to YRTC for murder" and, further, "[t]he average stay at YRTC is 7 to 9 months, and YRTC has no programs or services for a juvenile adjudged guilty of homicide."

As to evidence of violence, the court stated that there is evidence Leroux fought with the victim several times over several hours prior to the victim's death and that there "is obviously considerable evidence that the alleged offense included violence. . . . [T]he victim . . . sustained six stab wounds, which were penetrating in nature, rather than defensive."

Regarding public safety, the district court said, "[I]n the opinion of the Court, [this is] the most important factor to be evaluated in this case." The court explained that if Leroux was convicted, his minimum sentence for second degree murder would be 20 years' imprisonment coupled with a mandatory consecutive sentence for use of a deadly weapon to commit a felony of at least 1 year's imprisonment. The court concluded, "It is therefore obvious that if [Leroux] is convicted in this case, any sentence will extend well into his adulthood. [Leroux] could not be properly punished for the violent crimes which he allegedly committed, if he were transferred to juvenile court."

The court emphasized this point again when addressing § 43-276(1)'s factor (i), which considers whether secure detention or supervision is needed for a period extending beyond Leroux's minority. The court stated, "[T]he security of the public clearly requires that [Leroux] continue in secure detention for a period greatly extending beyond his minority if he is convicted of one or both of the crimes . . . ." The court observed that the YRTC is the most restrictive facility available to the juvenile court and that the YRTC is not a secure

facility. The NCYF, a secure facility, could hold Leroux until age 21 years 10 months. And the court concluded that "a secured facility is clearly the best available alternative in the event of Leroux's conviction."

### (i) Leroux's Argument

We initially note that with regard to amenability to treatment, Leroux focuses on his individual amenability to treatment as opposed to the district court's focus on the facilities and services available to treat Leroux. We discuss this distinction further when later considering whether the court abused its discretion.

Leroux contends rehabilitation rather than punishment is the better course for him given the evidence. As to what treatment Leroux would most likely be amenable to, Leroux relies heavily on Dr. Peraino's testimony, describing the areas of low, moderate, and high risk for Leroux. Leroux points out his "protective factors of 'strong attachment/bonds,' 'strong social support,' 'current commitment to school/work,' and 'positive attitude toward intervention and authority.'" Brief for appellant at 23. "The latter protective factor 'means he accepts help. He's willing to accept help [and] guidance. He will follow the advice of others.'" *Id*. Leroux also notes that Dr. Peraino found him to be very amenable to treatment and thought he would do well in community placement. Leroux further states:

> The record from this hearing shows that [Leroux] is in fact doing well in community placement now: he is engaged in schoolwork online, and spends time at Boys & Girls Clubs, where he participates in age-appropriate activities, receives tutoring and has the support of [Frederick], the Club staff and other children and teens who participate in the Club.

*Id*. at 24.

Leroux also directs us to the testimony of his Colorado attorney, Stinson, who explained the options for rehabilitation

treatment in Colorado if Leroux was adjudicated in juvenile court in Nebraska.

Leroux acknowledges that "[n]o reasonable person would dispute that the murder of . . . Fratis included violence," but Leroux disputes whether he was "the murderer." *Id*. at 28.

With regard to public safety, Leroux relies on the testimony from Stinson, noting that public safety is served by adjudicating juveniles in a rehabilitation-focused juvenile system rather than in an adult correctional system. Leroux directs us to a 2013 federal study discussed by Stinson, which indicates that "'youth who were prosecuted in the adult system versus the juvenile system were 34% more likely to recidivate if placed into the adult system,'" thus making the community less safe by putting a child into the adult system. *Id.* at 32-33.

Leroux also argues that he had "not been a threat to public safety before the stabbing of . . . Fratis; and he disputes that he is the perpetrator of Fratis' murder." *Id.* at 33. Further, Leroux was released on bond on May 1, 2017, and since then has attended online classes and "resumed participation at the Boys & Girls Clubs, whose staff and other participants know of [Leroux's] charges but are providing a supportive environment for him." *Id*. Leroux points out that Colorado has the ability to obtain orders for "ankle monitors, GPS tracking and other forms of restrictions for offenders" believed to present a risk to public safety. *Id.* However, even after Leroux was charged in this case, no Colorado court, nor Colorado juvenile probation, has requested such restrictions, despite being aware of this case.

Finally, regarding whether Leroux's best interests and the security of the public may require that he continue in secure detention or under supervision for a period extending beyond his minority, Leroux argues that if this subsection was the most compelling factor, "it was incumbent on [the State] to present evidence that [Leroux] could not be rehabilitated before the expiration of juvenile court jurisdiction." *Id.* at 34.

Leroux contends that the evidence shows he is doing well on probation and that no new restrictions have been placed on him. Leroux also submits that there was no evidence presented that Leroux "represents an ongoing threat to the public." *Id*. at 40.

### (ii) State's Argument

The State points to Pierce's testimony that the scope of services offered at the NCYF are more substantial than those at the YRTC. As for consideration of Colorado's youth residential facilities, the State says the district court's decision to disregard such services is supported by the record. The State directs us to Pierce's testimony that, hypothetically speaking, in the case of a juvenile from another state who is adjudicated in Nebraska, if more than 90 days of supervision remain, juvenile probation supervision would be transferred to the juvenile's home state. However, "a juvenile from Colorado who was recommended confinement in a juvenile facility would complete that sentence in Nebraska." Brief for appellee at 12. "The record does not suggest that confinement in a secure Colorado facility would be available to be ordered by the juvenile court in Nebraska in connection with this case." *Id*.

Regarding violence, the State contends that "[t]he district court is not asked to evaluate whether there is evidence that *the defendant* committed violence," but, rather, it must consider whether there is evidence that the alleged offense included violence. *Id*. at 13. There was evidence of the stabbing in this case; therefore, the State contends it was appropriate for the court to determine that this offense included violence.

Regarding public safety, the State combines its argument for § 43-276(1)'s factors (g) and (i). The State points out the district court's determination that the YRTC did "not have secure enough facilities or lengthy enough jurisdiction over Leroux to ensure public safety." Brief for appellee at 15. The YRTC is the most restrictive facility available to the juvenile

court, and it is not a secure facility. The State argues it was not an abuse of discretion for the court to determine that "public safety would require a person convicted of the violent crimes in this case to be secured beyond Leroux's minority." *Id*. The State contends that "the factors do not require the district court to speculate upon Leroux's guilt or innocence" and that "this crime was violent and the charges against Leroux are serious." *Id*. at 16.

(b) Factors Favoring Transfer
to Juvenile Court

The district court found six of the factors set forth in § 43-276(1) favored transfer to the juvenile court, namely: (d) Leroux's age, (e) Leroux's previous history, (f) Leroux's best interests, (h) Leroux's ability to appreciate the nature and seriousness of his conduct, (l) whether Leroux has been convicted of or has acknowledged unauthorized use or possession of a firearm, and (n) whether Leroux is a criminal street gang member.

The district court noted that Leroux was 15 years old on the date of the charged offenses and was 16 years old at the time of the juvenile transfer hearing. The court further stated that "[t]he alleged victim was 25 years of age at the time of his death" and that "two other adults were living in the residence with two minor children." The court indicated that the adults were charged with child abuse because of the drug activity in the residence, but that no other parties were charged with the homicide.

The court acknowledged that Leroux had "a minimal prior record" and that his only conviction was for a Class II misdemeanor involving obstruction of a police officer. The court did point out that Leroux was presently on probation in Colorado, that the probationary order prohibited Leroux from traveling outside Colorado without permission, and that a violation of that probation was filed based upon the current offenses. Also, Leroux's presence in Nebraska on the date of the offenses

could be considered a violation of his probation, as well as any possession or consumption of alcohol or marijuana. According to the court, "No other criminal convictions or juvenile adjudications were proven by the State."

When considering Leroux's best interests, the court stated, "The best interests of [Leroux] would be served according to Dr. . . . Peraino, a Licensed Clinical Psychologist, by treatment in a juvenile facility, rather than incarceration with adults, where [Leroux] would be subject to negative peer influences." And as for Leroux's ability to appreciate the nature and seriousness of his conduct, the district court acknowledged evidence presented by Dr. Peraino regarding Leroux's IQ, academic testing, and maturity level. The court also considered Dr. Peraino's testimony that the risk of Leroux's reoffending is relatively low, that treatment options should include psychotherapy and medication, and that for a majority of teenagers, punishment should be secondary to treatment.

The district court determined that the State failed to prove that Leroux has been convicted of or has acknowledged unauthorized use or possession of a firearm (§ 43-276(1)'s factor (l)), and there was no evidence that Leroux was a criminal street gang member (§ 43-276(1)'s factor (n)). Neither party disputes the court's findings as to these two factors.

### (i) Leroux's Argument

Leroux points out Dr. Peraino's observation that Leroux "is psychologically functioning at a less-than-average level for a 16-year-old . . . with his underdevelopment falling primarily in emotional areas, with a personality style of submission, dependency and conformity." Brief for appellant at 29. Leroux states, "Dr. Peraino found that [Leroux] is not inherently oppositional or unruly, and that he 'remains minimally engaged with others allowing him to avoid taking the initiative,' per his valid scores on normed personality testing." Id. Further, Leroux states that he "did not score at elevated risk of anger

and violence compared to other juveniles his age — to the contrary, he scored low-risk on those metrics" and that "evidence was not disputed." *Id*. at 29-30.

Leroux argues that the State presented no evidence to challenge the testimony of Dr. Peraino, Frederick, or Stinson.

As to Leroux's prior history, Leroux acknowledges the prior history as set forth by the district court and points out that the State "presented no evidence that [Leroux] had a history of antisocial behavior; no patterns of physical violence; and his criminal history was neither against the person or relating to property." *Id.* at 31.

As for best interests, Leroux points to Stinson's testimony about Colorado's evidence-based practice resources and interventions to reduce recidivism and provide treatment to a juvenile and Leroux argues Colorado provides "one-on-one trauma-informed care, which is indicated for [him] as he has been exposed to trauma multiple times in his short life." *Id.* Leroux says the State's probation officer witness "could not identify whether [Leroux] would receive trauma-informed care . . . or what programs are actually available for [Leroux] at NCYF." *Id*. Leroux suggests that if he were first ordered to a term at the YRTC in Kearney, he could then be transferred to Colorado where his treatment needs and risk potential would be reassessed, and an appropriate treatment plan would be developed and administered in Colorado.

Leroux directs us to Dr. Peraino's testimony that Leroux's best interests would not be served by correctional placement; rather, Leroux would be vulnerable to learning things that are antisocial in nature, which would not be good for his long-term adult functioning. Also, Dr. Peraino has observed that Leroux has responded well to his current juvenile probation program, which suggests he is responsive to treatment.

As to § 43-276(1)'s factor (h) (ability to appreciate nature and seriousness of conduct), Leroux refers to Dr. Peraino's findings regarding Leroux's subaverage maturity and his

submissive and conforming nature. Leroux also contends that this factor again presumes a defendant's guilt and that the State presented no evidence bearing on this factor.

### (ii) State's Argument

The State says there "is no serious dispute" as to § 43-276(1)'s factors (d) (age of juvenile and others involved), (l) (no firearm use or conviction), and (n) (not a gang member). Brief for appellee at 14. As for the remaining factors favoring transfer to the juvenile court, the State acknowledges the district court's findings as to those factors.

### (c) Neutral Factors

The district court found four of the factors set forth in § 43-276(1) to be either inapplicable or incapable of being determined at this stage of the proceedings, namely: (c) motivation for the commission of the offense, (j) whether the victim agrees to participate in mediation, (k) whether there is a juvenile pretrial diversion program pursuant to Neb. Rev. Stat. §§ 43-260.02 to 43-260.07 (Reissue 2016), and (m) whether a juvenile court order has been issued for the juvenile pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016). Factor (m) is relevant when after a disposition under Neb. Rev. Stat. § 43-247(1), (2), (3)(b), or (4) (Reissue 2016), the court enters an order, after an evidentiary hearing, finding the juvenile is not amenable to rehabilitative services provided under the Nebraska Juvenile Code; such an order may be considered in a future juvenile transfer motion. Neither party disputes the court's conclusion that factors (j), (k), and (m) are inapplicable to the present case.

As to § 43-276(1)'s factor (c), the motivation for the commission of the offense, the district court stated:

> The motivation for the commission of the offense is inconclusive at this point. [Leroux] and the victim [were] allegedly consuming alcohol and using Marijuana, and fought on several occasions during the early morning

hours of March 28, 2017. No other motive was proven during the hearing held on October 18, 2017.

### (i) Leroux's Argument

With regard to the motivation factor, Leroux contends, "This is a factor that presumes that [Leroux] is guilty." Brief for appellant at 28. Leroux claims that Nebraska appellate courts have not "answered whether guilt may be presumed for the purposes of disposition of a motion to transfer jurisdiction to juvenile court." *Id*. Further, the State presented no evidence of any theories related to motivation. Although Garcia and Derrera said Leroux and Fratis were fighting, "there was no explanation of what the reason for the fight was" and there are "documented histories of violence with Fratis" involving Derrera, and possibly Garcia. *Id*.

### (ii) State's Argument

The State acknowledges that the district court concluded the motivation for the commission of the offenses is inconclusive.

### (d) Other Matters Relevant to Aid Decision

Factor (o) is the final consideration set forth in § 43-276(1), and it provides for "such other matters as the parties deem relevant to aid in the decision." For this factor, the district court stated it was disregarding all evidence of rehabilitative services in Colorado because, whether Leroux was committed by the juvenile court to the YRTC or sentenced to confinement at the NCYF, there was no evidence that the State would seek or agree to transfer Leroux to Colorado.

Under this factor, Leroux asks this court to consider the evidence presented thus far:

> [T]wo adults, cousins to each other who have two children together, have accused of murder their much younger third cousin who was in Nebraska only because they brought him here. . . . The female adult left the crime scene without summoning help for her "brother"/cousin

who was exsanguinating on the floor, although she did take the time to throw the knife in the sink, perhaps rinse the knife and collect her marijuana and drug parapher-nalia as well as taking the presumably greater time to gather her two small children before leaving the house. . . . The male adult, who has a documented history of violence involving the deceased . . . , also did not call 911, nor did he take his "brother"/cousin to the hospital himself. . . . Both adult cousins lied repeatedly to law enforcement in the course of multiple interviews. . . . A convenience store video image of [Leroux] just minutes after the murder shows him in a white T-shirt with no blood anywhere on him.

Brief for appellant at 36-37.

### 4. Was Denial of Transfer Abuse of Discretion?

The district court found four of the § 43-276(1) factors favored retaining jurisdiction in the district court, namely: (a) the type of treatment Leroux would most likely be amenable to, (b) evidence of violence, (g) consideration of public safety, and (i) whether Leroux's best interests and the security of the public may require that Leroux continue in secure detention or under supervision for a period extending beyond his minority and, if so, the available alternatives best suited to this pur-pose. There were six factors favoring transfer to the juvenile court, namely: (d) Leroux's age, (e) Leroux's lack of previ-ous history, (f) Leroux's best interests, (h) Leroux's ability to appreciate the nature and seriousness of his conduct, (l) no past conviction of or unauthorized use or possession of a firearm; and (n) Leroux is not a gang member. There were three fac-tors that were not applicable (mediation, pretrial diversion, and prior juvenile disposition order finding juvenile not amenable to rehabilitation services). The factor regarding motivation for the commission of the offense could not be determined at this stage of the proceedings.

With regard to the four § 43-276(1) factors upon which the district court based its decision to retain the case, no one disputes the violent nature of the offenses charged. However, we view the evidence from a slightly different perspective than the district court as to two other factors: (a) amenability to treatment and (g) public safety. With regard to Leroux's amenability to treatment, as mentioned earlier, Leroux points to evidence focusing on his individual amenability to treatment as opposed to the district court's focusing on the facilities and services available to treat Leroux. While it was reasonable for the district court to consider the treatment options available at the NCYF as compared to the YRTC, we think it is also important to take into consideration Leroux's individual amenability to treatment. In that regard, the evidence from Dr. Peraino established that Leroux has strong bonds with his family, has strong social support, and is currently committed to school and work. Importantly, Dr. Peraino stated that Leroux "has a positive attitude towards intervention," which "means he accepts help. He's willing to accept help. He's willing to accept guidance. He will follow the advice of others." He agreed these are influential areas that help to reduce the risk of recidivism. Dr. Peraino also stated that if Leroux received appropriate treatment, his prognosis in terms of psychological development "would be great." The evidence certainly supports that Leroux is amenable to treatment. That said, we cannot say the district court abused its discretion in determining that Leroux's best option for such treatment would be at the NCYF rather than the YRTC.

With regard to public safety, the district court said that "in the opinion of the Court, [this is] the most important factor to be evaluated in this case." The explanation given by the court was that if Leroux is convicted, the minimum sentence for second degree murder would be 20 years (plus the consecutive sentence on the deadly weapon charge), and so if convicted, any sentence would extend well into Leroux's adulthood. Also, the court stated that Leroux could not be properly punished

for the violent crimes which he allegedly committed if he was transferred to juvenile court. Based on this explanation, it appears the district court approached the public safety factor from a sentencing and punitive perspective, rather than considering whether Leroux posed a threat to public safety. We see the public safety factor as encompassing whether the record supports that Leroux is likely to be a danger to the public if his proceedings were transferred to the juvenile court for his custody and treatment. Considering the record from that perspective, there was no apparent public safety issue at the time the court entered its order denying transfer on October 27, 2017. By that time, Leroux had not been in custody since May 1. A bond of $1 million, "Ten Percent Allowed," was set on April 11, and on May 1, the 10 percent was posted and Leroux signed a waiver of extradition consenting to return to Nebraska to answer to the charges pending against him. In its October 27 order denying transfer, the district court observed, "There is no suggestion that [Leroux] has committed any criminal offenses while out on bond, and he has appeared for all scheduled hearings." The court then proceeded to reduce Leroux's bond to "$50,000 cash."

Leroux points out that since his May 1, 2017, release on bond, he has attended online classes, has "resumed participation at the Boys & Girls Clubs, whose staff and other participants know of [Leroux's] charges but are providing a supportive environment for him." Brief for appellant at 33. There was no evidence of any trouble with Leroux from the time of his release on bond to the time of the juvenile transfer hearing. Further, Dr. Peraino testified that Leroux scored "fairly low on being forceful, being dominating, being aggressive," and "relatively low on risk for reoffense," and Frederick described Leroux as a "[v]ery normal, very average, just a normal 15-year-old." The Boys & Girls Club was aware of Leroux's charges, and Frederick was not aware of any problems with the staff or other children as a result. Leroux has continued to go to the club where he does his homework and "hangs out in

the peace and quiet of the teen room where there is always lots to do." Clearly, Leroux was not a present threat to the public based on this record, and we construe the court's reasoning on public safety as related more to having sufficient time to rehabilitate Leroux so that upon his ultimate release, there would be no danger to the public. Notably, public safety is closely tied to the final factor which the court found supported retaining the case, as discussed next.

Section 43-276(1)(i) requires the court to consider "whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose." The district court stated, "[T]he security of the public clearly requires that [Leroux] continue in secure detention for a period greatly extending beyond his minority if he is convicted of one or both of the crimes." The court observed that the YRTC is the most restrictive facility available to the juvenile court and that the YRTC is not a secure facility. On the other hand, the court noted that the NCYF, a secure facility, could hold Leroux until age 21 years 10 months. And the court concluded that "a secured facility is clearly the best available alternative in the event of [Leroux's] conviction."

Summarized, when weighing public safety, it is evident that the district court was not convinced that Leroux could be rehabilitated within the limited time the juvenile court would retain jurisdiction. Therefore, the district court determined that the best alternative available to provide Leroux's treatment would be in a secured facility for the necessary amount of time to ensure the public's safety, and such a facility would only be available if the case was retained in the district court. And as noted earlier, in order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). Rather,

it is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id*. In this case, the district court concluded, "after balancing all of the factors and findings," that the safety of the public required confining Leroux beyond the age of 19 if he is convicted and that, therefore, a "sound basis thus exists for retaining [the] case."

Leroux argues that the State did not meet its burden and that 2017 legislative changes "reflect a growing sense by our state senators, reflective of an evolved national understanding, that absent competent evidence that a juvenile is a sociopathic monster, our calling is to identify problems and treat those problems." Brief for appellant at 41. "Our calling is to recognize that a 15-year-old boy with a minimal criminal history and exposure to trauma has many years ahead of him, and is at a critical fork in his road." *Id*. Leroux acknowledges that "[n]ot every juvenile charged with murder may belong in juvenile court — but this is a case in which a decision to transfer jurisdiction is supportable and is, simply, the right thing to do." *Id*. at 42. Further, Leroux correctly points out that § 43-276 does not prevent transfer of homicide charges to juvenile court.

Leroux asks this court to consider four cases in which the Nebraska Supreme Court affirmed each district court's denial of a request to transfer the case to juvenile court. Leroux argues he "is not comparable" to the defendants in those cases. Brief for appellant at 40. We briefly summarize the cases noted by Leroux: *State v. McCracken*, 260 Neb. 234, 240, 615 N.W.2d 902, 911 (2000) (13-year-old defendant convicted of first degree murder after he retrieved and loaded handgun from his mother's bedroom, then shot her twice in head while she slept on sofa; evidence showed defendant had "'persistent preoccupation with morbid content, with death and violence,'" and he was described as "'time bomb waiting to explode'"), *abrogated on other grounds, State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002); *State v. Mantich*, 249

Neb. 311, 317, 543 N.W.2d 181, 187 (1996) (juvenile defendant convicted of first degree murder and use of firearm to commit felony; victim was kidnapped, robbed, and terrorized at gunpoint before being shot in head; defendant admitted pulling trigger and being "a big shot"; and defendant was 16 years old at time of crimes as stated in *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014)); *State v. Reynolds*, 247 Neb. 608, 529 N.W.2d 64 (1995) (16-year-old defendant was on parole from YRTC when he attempted to steal car, and when trying to escape, threatened owner with screwdriver; defendant previously served in juvenile detention facility, and his history indicated he did not respond to rehabilitation efforts); and *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992) (16-year-old defendant sexually assaulted and murdered 17-year-old girl, who he knew from school, in home where she was babysitting, and brutality of crimes evidenced by numerous injuries to victim, including hemorrhages around her neck caused by electrical cord wrapped around it; injuries caused by vaginal and anal penetration; bruises on her back, shoulder, and hip; traumatic laceration on her head; deep blunt injury between her eyebrows and upper portion of her nose; blackened eye; and large, gaping laceration on her right wrist down to bone).

Leroux claims that in each of these cases, there were four factors in common: each defendant was known to be a violent and aggressive offender, each defendant had needs beyond that of the juvenile justice system, each defendant was a repeat offender, and each defendant had exhausted the services of the juvenile justice system. Leroux argues that these same factors are not supported by the evidence in this record and that Leroux "is not comparable" to those defendants. Brief for appellant at 40.

Leroux is correct that there are distinguishing factors in the cited cases when compared to the circumstances present here. Although the factual record relevant to the crimes in this case has not yet been fully developed due to our appellate review

now being conducted at this interlocutory stage rather than at the conclusion of the proceedings, the record nevertheless does present considerable evidence regarding Leroux. We know that Leroux does not have a history of being a violent and aggressive offender, nor can he be characterized as a repeat offender. Other than his misdemeanor offense and the circumstances underlying this case, Leroux has no criminal history or other history of violent behavior. Leroux has been responsive to services made available to him through the Boys & Girls Club, and he has participated and behaved appropriately there. He also appears to have complied with his juvenile probation terms, other than for issues related to the present charges.

These characteristics do set Leroux apart from the defendants in the cases noted above, and they certainly support transferring Leroux's case to the juvenile court. If Leroux's history, best interests, ability to appreciate the nature and seriousness of his conduct, and his amenability to treatment were the only factors prescribed by statute, it would have been an abuse of discretion to not transfer the case. However, even though these factors may distinguish Leroux from the cases he directs us to, there are other factors to be considered.

Some of the other factors the district court had to consider in this case are also present in the cases cited by Leroux. Most notably, there are similarities with regard to the severity of the offense charged, the perceived threat to the public's safety, and the concern that rehabilitation could not be completed before the defendant would reach the age of majority and the juvenile court would no longer have jurisdiction. We note that while the factors favoring transfer in this case center on the individual characteristics of Leroux and his ability to be rehabilitated, the factors favoring retention focus more on the severity of the offense and the rehabilitative and/or punitive options available to keep the public secure while the juvenile is being rehabilitated. In some of the cases summarized above, neither the personal characteristics of the defendant nor the

available options for the protection of the public supported transferring the case to juvenile court.

For example, in *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000) (13-year-old defendant shot mother in head while she was sleeping), *abrogated on other grounds, State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002), the key factors noted for retaining jurisdiction in the district court included the violent and aggressive nature of the act perpetrated against a person and the obvious threat to the public from the defendant. The Nebraska Supreme Court stated:

> In spite of [the defendant's] youthful age at the time of the crime, the extreme violence perpetrated upon the victim and the protection of the public in light of [the defendant's] poor psychiatric prognosis lead us to conclude that the district court did not abuse its discretion when it denied [the defendant's] motion to transfer to the juvenile court.

*State v. McCracken*, 260 Neb. at 249, 615 N.W.2d at 916-17.

While the defendant in *McCracken* had a poor psychiatric prognosis, Leroux's psychiatric prognosis is certainly more positive. Dr. Peraino testified that if Leroux received appropriate treatment, his prognosis in terms of psychological development "would be great." *McCracken* would suggest that a poor psychiatric prognosis combined with an extremely violent crime and concerns about the safety of the public can tip the balance toward keeping the case in adult court and that doing so does not constitute an abuse of discretion.

In the other cases summarized above, the focus appears to have been more on the severity of the offense and the lack of juvenile facility options which would be capable of safely housing and rehabilitating a juvenile who has committed such an offense. In other words, the courts express concern about the lack of an appropriate facility where the juvenile can be securely detained while receiving necessary services and treatment, and further, the courts express concern for the public's safety in the event that treatment is not completed by the

time the juvenile system would lose jurisdiction. For example, in *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996) (juvenile defendant; victim kidnapped, robbed, and terrorized at gunpoint, then shot in head), the district court found that the offense included violence and was performed in a highly aggressive manner; further, the defendant had previously been involved with the police for property offenses, and there were no juvenile facilities appropriate for treatment and rehabilitation of a juvenile who had committed murder. The security of the public required that the defendant be incarcerated for a period extending beyond his minority, "which would render the juvenile system inadequate to address these needs." *Id.* at 319, 543 N.W.2d at 189.

These were the same concerns the district court had in the present case. The other two cases cited by Leroux similarly focus on the limitations of the juvenile justice system to address the needs of those particular defendants when weighed against the safety of the public.

In addition to the cases pointed out by Leroux, this court has reviewed several other cases in which a request to transfer to juvenile court was denied by the trial court and affirmed on appeal. In *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015), a 15-year-old defendant and accomplices struck the victim in the face with a gun and took her vehicle and cell phone. The defendant was previously adjudicated at age 13 and failed to take advantage of many opportunities for treatment options. The crime was committed in an aggressive and premeditated manner, and the defendant had gang involvement and a history of violence. It was determined that custody or supervision would be needed beyond his minority.

In *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015), the 15-year-old defendant was involved in the same crime as the defendant in *State v. Stevens, supra*. This defendant had been in secure detention at least four times, had run away three times, had escaped from the YRTC, and was previously adjudicated for two assaults and various criminal

mischief violations. He identified with a gang, and the offense was committed in an aggressive and premeditated manner. Further, the defendant demonstrated an unwillingness to participate in programming in juvenile court over a 3-year span.

In *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009), a 14-year-old defendant fired shots which killed a 6-year-old child sitting in a car. The shooting stemmed from the defendant's earlier confrontation with a woman who the defendant then shot at later, but at least two shots fired by the defendant entered the rear window of the car, striking and killing the child. The defendant was previously in juvenile court by age 11 for third degree arson, and again for disorderly conduct. The defendant had a history of behavior problems at home and in school, used marijuana daily and alcohol periodically, and after weapons-related charges, the defendant was placed in a group home for therapy and chemical dependency counseling but failed to return twice after weekend passes and then ran away. The defendant's caseworker testified that the defendant was unfriendly, very rude, and disrespectful and that the defendant blamed the caseworker for the fatal shooting. It was concluded the defendant could not be rehabilitated before reaching age 19. The defendant claimed the State failed to present evidence he was not amenable to further treatment through the juvenile court. However, the violent nature of the crime, the defendant's previous history of violent and aggressive behavior, and the defendant's failure to respond positively to corrective treatment, all supported retaining jurisdiction in the district court.

In *State v. Jones*, 274 Neb. 271, 739 N.W.2d 193 (2007), a nearly 17-year-old defendant, along with others, attacked and fatally stabbed the victim 69 times. Although the defendant was not as culpable as his accomplices, he was involved in the planning and commission of the crime. There was concern whether, given the severity of the crime, there were appropriate juvenile services available, plus there was limited time before the juvenile court would cease to have jurisdiction.

In *State v. Johnson*, 242 Neb. 924, 497 N.W.2d 28 (1993), a 15-year-old defendant fatally shot a man and was convicted of first degree murder and use of a firearm to commit a felony. The severity of the crime and the public's security weighed against transfer. Also of concern was the fact that the juvenile court could only retain jurisdiction until age 19 and would be ill-suited to effectively rehabilitate the defendant.

In *State v. Doyle*, 237 Neb. 60, 464 N.W.2d 779 (1991), a 15-year-old defendant and a coperpetrator burglarized a pawn shop, taking guns and ammunition. They subsequently stole a van and went to a shopping mall where the coperpetrator pointed a loaded gun at the victim in an attempt to rob her of her vehicle. The district court failed to set forth specific findings when it denied the transfer, so the cause was remanded for the court to make its findings. When the case returned in *State v. Doyle*, 237 Neb. 944, 468 N.W.2d 594 (1991), the denial of the transfer was affirmed. The primary concerns in that case included the following: the ability to rehabilitate the defendant by age 19, the defendant's failure to observe terms of a prior juvenile probation order, the defendant was on probation for burglary when he engaged in further unlawful conduct, the motivation for the charged offense was to use violence and unlawful conduct for enrichment of the defendant, and the facilities for treatment and rehabilitation were better available if the case was kept in the district court.

In another case that also had to be remanded for specific findings, a denial of a juvenile transfer request was affirmed when it returned after remand in *State v. Phinney*, 236 Neb. 76, 459 N.W.2d 200 (1990). In that case, a 15-year-old defendant committed a "premeditated act of violence which resulted in the death of his mother." *Id.* at 82, 459 N.W.2d at 204. There was evidence that the defendant's social skills were "fairly primitive," the defendant had "character problems" that would require therapy, and it was possible "retraining" could not be accomplished before the defendant turned 19. *Id.* at 79, 459 N.W.2d at 202. The defendant had no prior criminal history, but

there was no evidence that the defendant could be "retrained" and "cured" by the time he was 19. *Id*. at 80, 459 N.W.2d at 203. The Nebraska Supreme Court pointed out that although there was testimony that the defendant could be successfully treated at a youth center in Kearney and could be released back into society without posing a danger to society, it also noted the evidence that it was possible the defendant might still have problems after turning 19. The Supreme Court stated, "The district court apparently was not convinced that defendant could be rehabilitated within the time the juvenile court would retain jurisdiction over him and was concerned about defendant's premeditated act of violence which resulted in the death of his mother." *Id*. at 82, 459 N.W.2d at 204.

The Nebraska Supreme Court recently released a decision involving the denial of a juvenile transfer request. In *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018), a 15-year-old defendant was charged in district court with attempted second degree murder, robbery, attempted robbery, and three counts of using a deadly weapon (firearm) to commit a felony, all arising from two armed robberies which took place in March 2016 in Omaha, Nebraska. The defendant had previously committed armed robberies when he was 14 years old, and he was ultimately returned to his mother's home in December 2015. He was ordered to wear an electronic monitoring device and to abide by certain conditions; he was also ordered to participate in counseling and gang prevention services. Despite these efforts, the defendant committed the March 2016 robberies.

The defendant's evidence at the transfer hearing in *Hunt* included testimony from the defendant's juvenile probation officer, who claimed that the defendant had been "respectful, patient, open, and honest with her." 299 Neb. at 577, 909 N.W.2d at 368. The probation officer said the defendant was a member of a gang in Omaha and would benefit from a structured rehabilitative environment. However, the defendant "was rejected by both Boys Town and Omaha Home for Boys

primarily due to the serious nature of his [earlier] charges." *Id.* The defendant and his family received numerous services, including family support, gang intervention, therapy, and electronic monitoring. The defendant was ordered to attend school and therapy, but within a few weeks he was suspended from school for fighting, began missing curfew, cut off his electronic monitoring device, and used marijuana. The probation officer testified that the secure youth detention facility in Kearney could not reject the defendant and offered therapy and services directed to youth which the probation officer believed would benefit the defendant. The probation officer did note that therapy and other services were also available in adult prisons.

[6] The Nebraska Supreme Court observed that the district court found that the defendant's current and prior offenses were extremely violent and aggressive and were committed in a premeditated manner. The defendant was charged with crimes of violence involving guns, and "his crimes exhibited sophistication and maturity." *Id.* at 578, 909 N.W.2d at 369. The defendant was a gang member, and although he might be amenable to treatment, "there were no guarantees 'or even reasonable assurances' that [the defendant] would be accepted into a group home setting given this was his second episode of seriously violent offenses within a 9-month period." *Id.* The district court had concluded that without detention and rehabilitative treatment, the defendant presented a serious risk to the community, and further, that it was in the defendant's best interests to be continued in secure detention. After weighing the statutory factors, the district court concluded there was a sound basis for retaining jurisdiction over the case. The Supreme Court affirmed, noting that "[w]hen a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court." *State v. Hunt*, 299 Neb. 573, 583, 909 N.W.2d 263, 372 (2018).

The theme evident in the cases discussed above is this: When a juvenile commits a violent crime, the trial court is not likely to grant a request to transfer to the juvenile court because (1) the juvenile court will lose jurisdiction when the defendant turns 19 years of age which may not allow sufficient time for the complete rehabilitation of the juvenile, and therefore retention is necessary to ensure public safety, and (2) there is no secure youth detention facility available which can safely provide the appropriate services and treatment for a juvenile who has committed a more serious offense. This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated. The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes. As exemplified in Dr. Peraino's testimony, if Leroux received appropriate treatment, his prognosis in terms of psychological development "would be great." Whereas, if he was put into a correctional setting, "given our discussion previously about his vulnerability, submissiveness, dependency, . . . he would be vulnerable to learning things that are antisocial in nature. And that would not be good for his long-term adult functioning."

While in some of the cases discussed above, the aggressive, violent, or premeditated nature of the offense combined with the mental health or historic behaviors of the juvenile were such that it was clear that the services, facility options, and age limit of the juvenile system could not safely house and rehabilitate the juvenile before the juvenile court would lose jurisdiction. In the instant case, it is less clear. Although the district court found many of the statutory factors favored transferring Leroux to the juvenile court, the court weighed more heavily its concerns for public safety, namely, that the time left to

treat Leroux under the juvenile court's jurisdiction would not be sufficient and the security and services at the YRTC would not be adequate for someone convicted of more serious crimes, such as the ones at issue here.

The State agrees with the district court's focus on the serious nature of the crimes and the limited timeframe in which to treat Leroux if under the juvenile court's jurisdiction. The State acknowledges that although Leroux "made a significant factual record at the transfer hearing," the "weighing [of] those facts is the province of the trial court." Brief for appellee at 16. The State points out that Leroux is alleged to have violently and fatally stabbed the victim six times, and at age 16, Leroux "will only remain in the jurisdiction of the Nebraska juvenile court system for 2.5 years." *Id*. at 17. Because the YRTC is not secure and can house offenders for only a limited period of time and because the NCYF has more extensive programming available for offenders, the State contends the district court did not abuse its discretion in retaining jurisdiction over the case.

There is no question that Leroux presented the district court, and thus, this court, with a very well-considered and thorough record to review an extremely difficult issue. That Leroux "is at a critical fork in his road" no doubt weighed heavily on the trial court, as it does this court. See brief for appellant at 41. In our review of the record, we can certainly agree with Leroux that there was evidence supporting his request to transfer the case to juvenile court, and perhaps even enough to tip the scale more toward granting his transfer request. On the other hand, we can also agree with the State that the record supports the district court's decision to retain jurisdiction. And unless the evidence fails to support the district court's decision, then, as we noted at the onset of this opinion, we are constrained by our standard of review. Therefore, since the district court's basis for retaining jurisdiction over Leroux is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing

to transfer the case to juvenile court. See *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order denying Leroux's request to transfer the case to the juvenile court.

Affirmed.