IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ZACHARY H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ZACHARY H., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ZACHARY H., APPELLANT.

Filed January 21, 2025.    No. A-24-652.

Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Jonathan M. Braaten, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Christopher M. Reid for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Zachary H., a "railfan" or train enthusiast, allegedly caused a train derailment in order to video record it and post it on YouTube where he gained "300,000 hits." The derailment resulted in more than $350,000 in damages. Zachary was 17 years old at the time. The State filed a petition in the separate juvenile court of Lancaster County alleging two counts of criminal mischief; it simultaneously filed a motion to transfer the case to county court. The juvenile court granted the State's motion and Zachary appeals. Finding no abuse of discretion, we affirm.

## BACKGROUND

The July 24, 2024, petition filed against Zachary alleged two counts of criminal mischief, $5,000 or more, pursuant to Neb. Rev. Stat. § 28-519(2) (Reissue 2016), a Class IV felony. The

petition stated that the offenses occurred on April 22 and caused damage to property belonging to the Omaha Public Power District (OPPD) and the BNSF Railway (BNSF). On August 16, a hearing was held on the transfer motion. The testimony and exhibits reveal the following.

Thomas McCaslin, a special agent with the "BNSF Railroad Police Department," testified about his prior work as an officer and detective with the Omaha police department for 27 years. As a special agent for BNSF, he investigates crimes that occur on railroad property, and he has the authority to make arrests. He testified about a train derailment that occurred on April 22, 2024, in Bennet, Lancaster County, Nebraska. He said that an eastbound BNSF coal train, operating on a track "owned by OPPD bringing coal to a power plant owned by OPPD in Nebraska City" derailed at a "switch point as they were coming into Bennet." He added,

> The engineer and conductor noticed that the switch points that led onto a side track had been moved that would then cause the train to move onto the side track. They went into emergency stop, tried to stop, but were diverted because the switch was in the wrong direction. It was diverted onto the side track where they then hit a portable derail device which then caused the train to go up and off the rails and basically bury itself right along the side of the track, several -- I think it was five coal cars and two locomotives derailed.

McCaslin indicated that the damages for BNSF were approximately $200,000. The damages for OPPD were estimated at $150,000 if they "just rebuild the crossing portion where the main part of the damage is," but if they "rebuilt that whole stretch, we were told it would be around a half million."

McCaslin also testified about his concern that people could have been affected, along with greater property damage. He described there being two crew members on the train when it struck a stationary car on the side track and that there were people in the "three or four cars that were at the crossing that could have been affected." There were also very large propane tanks nearby and if those had been "punctured or damaged in some way, there could have been a very large explosion."

According to McCaslin, "[i]t was immediately pretty suspicious" that there had been some "human intervention" that caused the derailment because of the "switch being in the wrong position." Video surveillance from a nearby grain elevator showed that at about 5:52 p.m. on the evening of the derailment, a vehicle entered the area and parked near the tracks out of view of the camera. "But then somebody comes walking from the direction where the car had been parked and then walks up to the area where the switch is." The video showed the person making "a motion where you can see them kind of rocking back and forth" and "within a minute or two after that they leave the area on foot and then get in their car." The video showed the car leaving but then returning a few minutes later. An individual exited the vehicle and then went to the tracks and set up a camera tripod. The derailment occurred at approximately 6:10 p.m. The surveillance video was submitted to the Lincoln police department for video analysis, which was helpful in determining that this appeared to be a "tampering event" and that the individual in the video was Zachary.

McCaslin said that about 1½ to 2 hours after the derailment, Zachary approached another special agent at the scene and showed him that he had recorded video of the derailment. That special agent informed Zachary that he was recording their conversation with his body camera.

Zachary provided his video to investigators, and he also later posted it on YouTube where it subsequently had "300,000 hits." The vehicle observed in the security camera video was "extraordinarily similar" to Zachary's vehicle. Also, Zachary had identified himself to "BNSF police" as the person taking the video of the train's derailment. When Zachary asked the BNSF agent at that time if he knew what happened and the agent responded that the cause was unknown, Zachary proceeded to tell the agent what he believed happened. According to McCaslin, Zachary said, "'Well, obviously a switch was flipped the wrong way.'" In McCaslin's opinion, derailing a train under these circumstances would require some specialized knowledge of how trains and train tracks operate. When Zachary made his initial statements to the agent at the scene, he knew specific locomotive model numbers, he knew "everything about that train that would run through that specific stretch through Bennet," and he was "very familiar with the procedures and trains and how they worked."

On cross-examination, McCaslin agreed that Zachary was a "railfan," a "certain subculture of people that are interested in trains." He acknowledged that when Zachary was interviewed "around 8:30 [p.m.]," he was by himself and was not under arrest or in custody.

Zachary called Joshua Hain, a juvenile probation officer, to testify on his behalf. Hain conducted the juvenile intake of Zachary at the request of the BNSF special agents. Hain indicated that Zachary had no previous involvement with juvenile court or with law enforcement. Hain had been a juvenile probation officer for 10 months and was aware of the types of treatment available in the juvenile court system. However, "[d]ue to the nature of this case and not knowing any of the history of [Zachary], I don't know what would fit his needs best in this situation." When asked by the State whether Hain knew what type of probation services Zachary would be most amenable to, Hain responded, "I have very limited information about [Zachary]." He acknowledged that this was a "very unique incident" for juvenile probation to handle, but he also acknowledged that it is "unique" to have a "motion to transfer to adult court on someone with no previous involvement in the criminal justice system."

The parties stipulated that Zachary had no previous juvenile court history, that he had no prior convictions for unauthorized use of a firearm, that no order had been issued under Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016) (finding that juvenile is not amenable to rehabilitative services that can be provided under juvenile code), and that he had no affiliation with any gang. The parties agreed that these factors weighed in favor of the case remaining in juvenile court.

The State's position was that there would be limited time left to put juvenile services in place whereas adult probation on a felony would allow up to 5 years of probation. The State acknowledged that "while this wasn't a direct act of violence in the typical sense against a person," this was a "violent event in terms of it could have been catastrophic, depending on the speed of the train and what had happened." It pointed out that there were individuals on the train who could have been injured, and there were people in cars at the crossing. The State suggested Zachary did this for notoriety. It also expressed concern that there was not enough time for rehabilitation given Zachary's age, and the "adult side would give a longer time that he can be under supervision which would be in his best interest." It argued that public safety weighed heavily in favor of transfer; this was a "significant event that really could have endangered many people in the City of Bennet and really impacted that community there if this turned out worse than it had." As for Zachary's ability to appreciate the seriousness of his conduct, the State argued that "assuming [Zachary] is the one

that did this . . . he would have known exactly what could have happened with this derailment and . . . that this was a serious incident." The State also contended that deterrence was an important consideration to make sure that Zachary and others "do not engage in this sort of behavior and do something that can really cause a significant risk for both property damage [and] loss of life."

Zachary's attorney argued that Zachary had no prior criminal involvement and that "a one-year period of time is sufficient." Zachary was in therapy, his parents were involved, he had "everybody in place to be able to help make him successful." He was doing well in school, he was employed, and he had "multiple reference letters or support letters from people . . . that know [Zachary]." However, Zachary's attorney conceded at the close of his argument that "[w]e don't have many train derailment cases. And so, if the Court's position is that any train derailment should be in adult court, then I guess [Zachary's] case goes to adult court. But . . . we think it's clear that this case should remain in juvenile court."

The juvenile court entered an order on August 19, 2024, transferring the case to county court for further proceedings. It concluded that the State had proven by a preponderance of the evidence that the motion to transfer to the county court should be granted. We will set forth the juvenile court's specific reasons supporting its determination in our analysis below.

Zachary appeals.

ASSIGNMENT OF ERROR

Zachary contends the juvenile court abused its discretion by finding the State proved by a preponderance of the evidence that the proceedings should be transferred from juvenile court to county court.

STANDARD OF REVIEW

An appellate court reviews a juvenile court's decision to transfer a juvenile offender's case to county court or district court de novo on the record for an abuse of discretion. *In re Interest of Steven S.*, 299 Neb. 447, 908 N.W.2d 391 (2018). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

Zachary argues that his case should have been retained by the juvenile court. He points to this being a "singular occurrence"; that he "appreciates the nature and seriousness of the alleged conduct"; that he still resides with his parents, has a 3.6 grade point average, and "dreams of going to college to be an engineer"; and that he keeps busy with "extracurricular activities, including working part-time and church." Brief for appellant at 14-15. While we agree that there are factors that weigh in favor of retaining the proceedings in juvenile court, we cannot say that the juvenile court abused its discretion in concluding that the evidence supported the transfer.

LEGAL FRAMEWORK

The juvenile court has jurisdiction of "[a]ny juvenile who has committed an act which would constitute a felony under the laws of this state and who was eleven years of age or older at the time the act was committed." Neb. Rev. Stat. § 43-247(2) (Cum. Supp. 2024). Pursuant to Neb.

Rev. Stat. § 43-246.01(2)(a)(ii) (Cum. Supp. 2024), the juvenile court has exclusive original jurisdiction as to

> [a]ny juvenile who was fourteen years of age or older at the time the alleged offense was committed and the offense falls under subdivision (2) of section 43-247 except offenses enumerated in subdivision (1)(a)(ii) of section 29-1816 [accused 14 years of age or older but younger than 18 years of age when alleged offense is committed and is punishable as a Class I, IA, IB, IC, ID, II, or IIA felony].

Since Zachary was 17 years old when he was alleged to have committed two Class IV felony offenses, the proceeding against him had to originate in the juvenile court. See *In re Interest of Luis D.*, 29 Neb. App. 495, 956 N.W.2d 25 (2021) (when juveniles commit offense fitting under § 43-246.01(2), action against such juvenile offenders must always be initiated in juvenile court, but they are subject to transfer to county or district court for further proceedings under criminal code). Pursuant to § 43-246.01(2)(b), "[p]roceedings initiated under this subdivision (2) may be transferred as provided in section 43-274." Neb. Rev. Stat. § 43-274(5) (Cum. Supp. 2024) has been construed to allow for cases described in § 43-246.01(2) to be transferred to the county or district court once the case is initially filed in the juvenile court. See *In re Interest of Luis D., supra*.

When the prosecution seeks to transfer a juvenile offender's case from juvenile court to criminal court, the juvenile court shall retain the matter unless it determines that a preponderance of the evidence shows that the proceeding should be transferred to the county court or district court. See *In re Interest of Steven S., supra*. The prosecution has the burden by a preponderance of the evidence to show why such proceeding should be transferred. *Id*. The same factors in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2024) that are considered when determining whether to transfer a case from adult court to juvenile court are also applied in the context of a motion to transfer from the juvenile court to adult court. See *In re Interest of Steven S., supra*.

According to § 43-276(1), the juvenile court shall consider the following 15 factors when determining whether to transfer a case:

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the

juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The juvenile court does not need to resolve every factor against the juvenile and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. See *In re Interest of Steven S., supra.* It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.*

"An order granting or denying transfer of the case from juvenile court to county or district court shall be considered a final order for the purposes of appeal." § 43-274(5)(b).

STATUTORY FACTORS WEIGHING IN FAVOR OF TRANSFER

The juvenile court found the following seven factors under § 43-276(1) favored transfer: (c) motivation, (d) age, (g) consideration of public safety, (h) Zachary's ability to appreciate the nature and seriousness of his conduct, (i) Zachary's best interests and the security of the public require Zachary to continue in secure detention beyond his minority, (k) Zachary was not eligible for juvenile pretrial diversion, and (o) other matters (deterrence).

Regarding motivation, the juvenile court found the evidence established that Zachary had a "fascination with trains and is a 'railfan.'" It pointed out Zachary's "own estimation" that he had "over 200 train videos or images he had recorded." The court noted Zachary's posting of the video of the derailment on YouTube and that it had been "viewed over 300,000 times prior to its removal." "The remainder of his videos had only 200-300 views." The court also observed that Zachary submitted the derailment video to at least one news outlet. The court found, "Notoriety appears to be a significant motivating factor."

The juvenile court found that Zachary's age favored transfer because he was "turn[ing] 18 in approximately one month." The court also gave "[s]ignificant consideration" to public safety. It stated that the "train derailment had the potential for a catastrophic event." There was a "crew of two in the train," the train was "fully loaded with coal," and it "derailed within feet of a grain elevator, road crossing, and large propane tanks." The property loss was greater than $350,000.

As for Zachary's ability to appreciate the nature and seriousness of his conduct, the juvenile court found that "[w]hile there is no evidence of what has occurred since the derailment, the evidence gathered by law enforcement immediately after the derailment shows that [Zachary] had little insight to appreciate the nature and seriousness of his conduct." (We question whether this finding may be better placed as a factor supporting retention since a juvenile's inability to appreciate the seriousness of his conduct suggests an immaturity more properly addressed in the juvenile court. See *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018) (as to ability to appreciate nature and seriousness of conduct, juvenile's subaverage maturity and low IQ weighed in favor of transferring to juvenile court). See, also, *In re Interest of Jorge A.*, 31 Neb. App. 896, 990 N.W.2d 560 (2023) (if juvenile appreciates nature and seriousness of conduct and pursues it anyway, this weighs in favor of transfer to adult court).)

When determining that Zachary's best interests and the security of the public required Zachary to continue in secure detention beyond his minority, the juvenile court pointed out that Zachary would "turn 18 in one month" and the juvenile court's jurisdiction would "end at his 19th

- 6 -

birthday." "Given the seriousness of this offense, the potential it had for catastrophic outcomes to the public, and the significant damage to property which resulted, the security of the public may require the juvenile to be under supervision for a period extending beyond his minority." It noted that "[a]dult probation would be able to afford the juvenile this extended period of supervision thus ensuring the security of the public past his age of minority." The court stated that "[t]his factor weighs heavily to transfer the matter[.]"

Although the juvenile court acknowledged there was a juvenile pretrial diversion program available in Lancaster County, it concluded that the evidence established that Zachary did not meet the criteria to be eligible to participate in that program.

Finally, as to other matters deemed relevant to the decision, the juvenile court stated, "While accountability and rehabilitation are considerations the court must always consider, in an event such as this the court must give some consideration to deterrence." It added, "Deterring either the juvenile or others from engaging in actions that have the potential for catastrophe is significant and weighs in favor of transfer."

STATUTORY FACTORS WEIGHING IN FAVOR OF RETENTION

The juvenile court found the following eight factors under § 43-276(1) either weighed in favor of retaining the case in juvenile court or did not favor either transfer or retention: (a) type of treatment Zachary would most likely be amenable to, (b) whether the offense included violence, (e) no prior juvenile court adjudications or convictions, (f) best interests of the juvenile, (j) no evidence related to restorative justice, (l) no use of firearm nor prior convictions for the same, (m) no order issued under § 43-2,106.03, and (n) not a criminal street gang member. As noted previously, the parties stipulated that 4 of these factors, § 43-276(1)(e), (l), (m), and (n), favored retaining the case in juvenile court; the juvenile court therefore found these factors favored retention without further explanation. Additionally, the court found that no evidence was adduced as to (j) regarding whether the victim or the juvenile agreed to participate in restorative justice; thus, it concluded this factor did not favor transfer or retention.

Regarding the other three factors favoring retention, the juvenile court observed that the probation officer testified about the "array of services" available when a juvenile is adjudicated in juvenile court but that "it was unknown what specific types of treatment or services may be utilized given the juvenile had no prior history within juvenile probation." The court therefore concluded that the type of treatment Zachary would be amenable to did not favor either transfer or retention. As such, we view this factor as favoring retention in the juvenile court. See *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023) (when considering whether to transfer case from district court to juvenile court, statutory factors considered "neutral" or "not applicable" are equivalent to factors that favor transfer to juvenile court because of presumption that case should be transferred).

Regarding whether the alleged offense included violence, the juvenile court found that "[w]hile the potential for a catastrophic event was present," it could not "find the alleged offense included violence." It therefore concluded this factor weighed in favor of retaining the matter in juvenile court.

Finally, the juvenile court found that Zachary's best interests "would be for him to engage in and complete a rehabilitative program such that he no longer would pose a risk to public safety," and that this factor favored retention.

## NO ABUSE OF DISCRETION

Although, as indicated above, we question the juvenile court's treatment of § 43-276(1)(h) (juvenile's ability to appreciate nature and seriousness of his conduct) as a factor weighing in support of transfer to adult court, the record nevertheless supports the juvenile court's other articulated reasons for transferring the case. The most significant factor emphasized by the juvenile court was the serious nature of Zachary's conduct and the public's safety, along with the minimal time Zachary would remain under the juvenile court's jurisdiction. Although we are mindful of the many factors that support retaining the proceedings in the juvenile court, we cannot say that the juvenile court abused its discretion by placing the greatest weight on the serious nature of the conduct and the public's safety, along with the limited time left for rehabilitation under the juvenile court's jurisdiction. As this court has previously stated, a "trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. at 118, 916 N.W.2d at 929. "The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id*.

We also point out that "a transfer to adult court does not eliminate a disposition under the juvenile code." *In re Interest of Steven S.*, 299 Neb. 447, 459, 908 N.W.2d 391, 399 (2018). See Neb. Rev. Stat. § 29-2204.02(6) (Reissue 2016) (for Class III, IIIA, or IV felony, when defendant was under age 18 at time crime was committed, court has discretion to make disposition of defendant under juvenile code instead of imposing penalty provided for crime).

## CONCLUSION

For the reasons set forth above, we affirm the juvenile court's order transferring the case to the county court.

AFFIRMED.