IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WILSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TALAN R. WILSON, APPELLANT.

Filed July 1, 2025.   No. A-25-108.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Mallory N. Hughes, of Berry Law Firm, for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Talan R. Wilson, age 16, was charged in the Douglas County District Court with multiple felonies. Wilson appeals from the district court's order denying his motion to transfer the case to the juvenile court. Finding no abuse of discretion, we affirm.

## BACKGROUND

An information was filed on September 30, 2024, charging Wilson with the following seven counts: (1) robbery, a Class II felony (victim Dominique C.); (2) use of a deadly weapon (firearm) to commit a felony, a Class IC felony; (3) robbery (victim Franklin L.); (4) use of a deadly weapon (firearm) to commit a felony; (5) first degree murder, a Class IA felony (victim Mursal Jama); (6) use of a deadly weapon (firearm) to commit a felony; and (7) unlawful possession of a firearm by a prohibited juvenile offender-1st offense, a Class IV felony. All charges are related to events that took place on August 13, 2024.

- 1 -

On October 21, 2024, Wilson filed a motion to transfer his case to the juvenile court. On November 12, Wilson filed a motion to appoint an expert witness, "specifically, Dr. Kirk Newring—to conduct a psychological evaluation of [Wilson] . . . to explore all possible defenses and ascertain issues that may be relevant to the factors this Court is to consider." Dr. Newring was appointed by court order on November 21.

TRANSFER HEARING

The transfer hearing took place on January 17 and 27, 2025. Two witnesses testified for the State; one witness testified on behalf of Wilson. Numerous exhibits were received.

Heather Briggs, the chief deputy juvenile probation officer, testified about various evaluations, services, and placements available in the juvenile system. Briggs indicated that Wilson was placed on juvenile probation in December 2023 related to a stolen vehicle. He was placed "on the HOME program," which is run through the Douglas County Youth Center (DCYC); he was initially "just placed on tracker but graduated up to the electronic monitoring." Wilson "struggled while on the HOME program with regards to his whereabouts," he obtained a new law violation, and the HOME program refused to take him back. He was then placed at the "Omaha Home for Boys Crisis Stabilization Shelter" from January to April 2024. Wilson "struggled with behaviors" there, such as issues "with just accepting redirection from staff" and some "overall noncompliance within the program." According to Briggs, "Omaha Home for Boys, basically, said 'He's got to go.'" Wilson was then placed with his brother, who was his legal guardian. Juvenile probation provided "community youth coaching" and "day and evening reporting." Briggs indicated that Wilson was "successful with the community youth coach" until he "absconded later in June [2024]."

In June 2024, the guardianship with Wilson's brother was terminated, and Wilson was placed with his father, who resided in Council Bluffs, Iowa. Briggs stated that because Wilson now lived in Iowa, there were "very little resources we could provide without going through the interstate compact because jurisdiction was to terminate on July 31st." Juvenile probation continued to supervise Wilson and kept community youth coaching in place, but Wilson absconded from his father's home on June 13. A warrant was issued, "but then he had also received new charges and was presented to juvenile intake." Juvenile probation was ordered to "apply for shelter and foster care." Wilson was accepted to "Child Saving Institute and Boys Town"; he was denied at Omaha Home for Boys because of "how that placement ended." No "foster cares" had availability.

Wilson was placed at Child Savings Institute on August 6, 2024. He absconded on August 10. Briggs stated that Wilson was "on the run" until August 15 when "he was presented to juvenile intake for his capiases and new charges" which were "three counts of unlawful use of a firearm by a juvenile; murder, first degree; and robbery." When Briggs was asked to summarize the options available for Wilson if he were transferred to the juvenile court, she responded that they had exhausted "shelter"; there were no in-state or out-of-state group home options; Wilson did not qualify for "PRTF" (psychiatric residential treatment facility) based on his past diagnosis; and foster care would not be appropriate under the circumstances. Briggs agreed that the Youth Rehabilitation Treatment Center (YRTC) "would most likely be the only option we would have."

But she was concerned that he would only have "six to nine months" to complete the program there before his "re-entry" into a "community-based setting after that."

Briggs also testified about how Wilson was doing in detention at the DCYC, where he had been placed since August 2024. She indicated that there had been a "few incidents of aggression"; Wilson had been in "two physical fights" while there.

On cross-examination, Briggs was asked about Wilson's mother dying in 2023 and whether juvenile probation had done any professional assessment on the impact of her death on Wilson's "day-to-day functioning." Briggs responded that when Wilson was placed at the Omaha Home for Boys, they would have done an initial diagnostic interview, and that could have included a treatment plan to deal with "his past trauma of his mother's death." But she could not "speak to the specifics on that." Briggs agreed that if a psychological or psychiatric evaluation revealed that Wilson had "PTSD," he "could" qualify for "PRTF." Briggs also acknowledged that prior to the current offenses, Wilson's offenses and involvement with the juvenile court were nonviolent in nature. Briggs was not aware of Wilson having an individual education plan at school.

On redirect, Briggs explained that during Wilson's predisposition investigation, juvenile probation had recommended that he participate in individual therapy. However, Wilson told the predisposition officer "that he would not participate." She also noted that the various facilities have different criteria, but the "one that is pretty consistent" among them is that the juvenile's IQ "has to be above 80 for the functioning level." Otherwise, "they do not have the capabilities to be able to offer them the educational pieces that they would need." They also look at "run history," "gang involvement," and "the other kids" at that facility to make sure there would not be any conflicts that might disrupt "other kids' opportunities in that placement." Wilson's brother had brought up that Wilson "claimed to be a Blood" and was affiliated "with some youth that were in the Jumpout Gang." His "run history" was also a barrier to placement.

Chad Frodyma, a police officer in Omaha, Nebraska, was the "lead detective" on the underlying case. He testified about videos obtained from the police department and a local convenience store in Kansas City, Missouri; videos from outside a gun store in Nebraska City, Nebraska; a video from a convenience store near "120th and Dodge" in Omaha showing a robbery incident; a security video from the scene of the homicide; a police video; police cruiser videos from "Cass County Sheriffs and the Nebraska State Patrol"; a video from a storage area; and a video from a residence. The State offered exhibit 16, which was "about a ten-minute video . . . that has different segments of those situations" that occurred on August 13, 2024. There was no objection to that exhibit.

As testified to by Officer Frodyma, the first video clip shows a car pull up to a gun shop in Nebraska City; it is a vehicle that was stolen from Kansas City the day before. It is "about 6:30 in the morning" on August 13, 2024. A big rock is thrown through the front window of the gun store; a total of nine handguns were stolen. Three people were involved in that incident, one of whom was Wilson. The next video segment is from the evening of the same day at a convenience store near "120th and Dodge Street" in Omaha. There were six people involved in this incident, which included the same three people from the gun store incident. Officer Frodyma identified Wilson as wearing "all black and white tennis shoes and holding a handgun in his right hand." He observed three of the individuals to have firearms in their hands. They gathered around a person that came from a vehicle at the gas pump and then as that person walked away, some of them, including

Wilson, entered the vehicle. (Officer Frodyma later testified that this was "an attempted carjack, but they did not take it.") The video then shows the same "group of six" walking in the area of the homicide victim's home and approaching "the area of the garage." What is believed to be a gunshot is heard and then a security video from a "separate residence . . . around the corner" shows the homicide "victim's vehicle leaving." The next video clip shows the "same gun shop in Nebraska City" and the same vehicle that left the "scene of the homicide" approximately 50 minutes later. When a police vehicle pulls up, the vehicle leaves, and a pursuit is initiated.

Officer Frodyma testified that the pursuit started in Otoe County, Nebraska, and then went into Cass County, Sarpy County, and Douglas County; speeds were "in excess of a hundred miles an hour." The vehicle was "disabled somewhere around Highway 75 and Giles" and then "gets off onto the Q Street exit, heads west on Q, and then it turns northbound onto 46th Street." One person (not Wilson) "bail[s] from the vehicle" and "appears" to have "something in their hand." The video concludes when the vehicle "was disabled and somewhat crashes," and the other five people bailed out of the vehicle. According to Officer Frodyma, exhibit 17 is a report prepared by a crime analyst that shows a "timeline of all the vehicles that we believe to be involved in this incident from beginning to end." He said there were eight vehicles included, all "[e]ither a Kia or Hyundai," including the one stolen from Kansas City. He agreed it was "kind of a chain," where there is "an abandoned stolen vehicle and a new fresh stolen vehicle . . . in the same area." It was the officer's opinion that Wilson was associated with the thefts of every vehicle contained in the exhibit.

Officer Frodyma testified about screenshots from an Instagram account associated with Wilson. One photograph was taken from a video showing Wilson displaying a handgun; it was posted the day after the homicide. The officer identified the gun as a "Glock handgun with an extended magazine"; it was one of the guns taken from the gun shop in Nebraska City.

The State also offered exhibits 1 through 15, which were received without objection. The exhibits included police reports; a criminal history screen for Wilson; certified copies of Wilson's "juvenile docket" in three separate cases, and their associated police reports; "intake summaries" from August 15, 2024, related to the present incident, along with "historical intake summaries" from October 10 to October 12, 2023; Wilson's predisposition investigation; a juvenile services outline for what juvenile probation has to offer, authored by Briggs; Briggs' memo summarizing Wilson's probation services while on juvenile probation; "DCYC status reports"; a juvenile investigative report from DCYC; a "services brochure for what's available at DCYC"; and the "Douglas County Juvenile Center behavioral health initiative."

The defense called Dr. Kirk A. B. Newring, a licensed psychologist in Nebraska since 2007. He had testified at juvenile transfer hearings "[l]ess than a dozen" times, but since "leaving the Department of Corrections in Nebraska in 2009," he has had a private practice "mostly working with court-involved youth, adolescents, families in civil and criminal proceedings." In the "10 or 12" psychological evaluations he completed for juvenile transfer cases, there were "a couple where [he] was not in support" of the case being transferred to juvenile court. Exhibit 20, Dr. Newring's December 26, 2024, evaluation of Wilson, was received without objection.

When Dr. Newring was asked if he had formed an opinion about whether Wilson should be tried as a juvenile or adult, he responded, "No, I don't think I have formed that opinion." Dr. Newring testified that he completed "IQ testing" of Wilson when he met with him for "about three and a half hours face-to-face" that produced scores "in the range that would qualify for diagnosis

of borderline intellectual functioning." He explained that it is "below the low average range but not quite to intellectual disability diagnosis." According to Dr. Newring, a person who has a "relative deficit in cognitive abilities compared to peers would probably take longer to learn materials, to understand materials, to benefit from intervention and education, if provided, assuming all other skills were average." It was his opinion that Wilson had not been fully offered the services necessary. He assessed him as reading at the "third grade level" which could impact his behaviors. For Wilson, "that means services need to be at a level he can understand and comprehend." Dr. Newring was familiar with "Boys Town PTRF," a "psychiatric residential program at Boys Town," but "couldn't speak to" whether Wilson would meet their criteria.

Dr. Newring also testified about adolescent brain development issues, and that "youth of [Wilson's] age overestimate their abilities to succeed at tasks; underestimate the perceived peril of risky tasks; tend to do more impulsive things, especially when around peers." As applied to Wilson, Dr. Newring opined that Wilson "would go along in a group activity if it got him social interactions with others," that he "would be unlikely to weigh out the pros and cons of each step," and that "in the moment," he may "have thought that whatever bad is coming, they can work their way out of it or talk their way out of it."

In comparing services in the juvenile system to those in the adult system, Dr. Newring noted that because juvenile services had not "ever been at [Wilson's] level of ability," he would be "essentially, starting juvenile services." Dr. Newring acknowledged that "there's going to be an age-out effect" that would impact how long Wilson could get those services. In the adult system, "he would likely be around other inmates that may make efforts to exploit his naivety or impulsivity." Regarding educational opportunities in the "adult correctional system," he was not aware of a program "designed for somebody with [Wilson's] intellectual and academic abilities that would work on his schooling in the adult system," whereas he is "advised it is available for the juveniles."

According to Dr. Newring, "this is a really important time to get . . . emotion regulation, behavior regulation, and academic skills strengthened." "[R]esearch literature" shows that "for the large part, misbehavior in adolescents, once corrected, does not predict a lifetime of adult criminality." Dr. Newring stated, "There are a lot of juveniles that have offenses, including violent offenses, that don't persist to be adult offenders." When asked if "public safety concerns could be reduced if [Wilson's] given the right rehabilitative plan," Dr. Newring responded affirmatively. He also agreed that with the "right rehabilitative plan," Wilson "could come to better understand the nature and seriousness of the offenses that he's alleged to have been involved in." But to develop an "appropriate rehabilitative plan" for Wilson, Dr. Newring indicated that he would need to be assessed for "trauma, PTSD, or other things that may be related to either his mother's death or other things that he's experienced."

On cross-examination, Dr. Newring agreed that Wilson is "not a good candidate for group-focused treatment." He acknowledged that he had not reviewed any of the police reports because "[t]hey weren't available to [him]" and he had not seen any of the videos until he saw them during the hearing. However, he had accepted "as the factual basis for the evaluation that [Wilson] was present and had handled a firearm and was present at the crimes as alleged." Dr. Newring stated that Wilson had acknowledged to him that he had a firearm "during that day or . . . . into the next." He agreed that Wilson participating in stealing firearms at the gun shop and using

a firearm to place people in fear to rob them was more than "handling the gun." He also agreed the offenses were violent. Dr. Newring acknowledged talking to Wilson about "his expertise" in "stealing Kias" that Wilson said he learned from a "social media video" and that it was "a fairly easy way to steal vehicles." He agreed that Wilson had stolen multiple vehicles and had been involved in juvenile court previously for a stolen Kia. He also stated that it would be difficult to give treatment to people who abscond, and he acknowledged that a "day to two before this incident," "CSI" was "going to try and use rehabilitative services with [Wilson], and he left." He also acknowledged that when Wilson had been on probation with his father, he "absconded from where he was supposed to be."

At the second day of the hearing on January 27, 2025, two exhibits were received in lieu of testimony; both were received without objection. One exhibit was an affidavit from a pastor who had known Wilson, his mother, and his older brother since 2015. He had observed Wilson's mother to "care deeply for her children" and she was "actively engaged in church activities." Wilson's mother "was tragically killed in a car accident in Tennessee during the summer of 2023" while Wilson and his brother were attending a church youth camp. After that, the pastor observed "emotional and behavioral changes" in Wilson; Wilson became "involved in troubling activities" and there was "a noticeabl[e] decline in his overall demeanor." It was the pastor's opinion that the death of Wilson's mother "had a significant and adverse impact" on Wilson's behaviors and that he had not received the "trauma treatment and psychological treatment he probably needs in order to process his mother's death as a young 16-year-old."

The other exhibit was an affidavit from Dr. Newring clarifying his earlier testimony regarding his receipt and review of "police reports and surveillance." He acknowledged he had received a link to those items on December 17, 2024, and he recalled that he "did review such discovery" prior to the January 17, 2025, hearing. He was therefore mistaken when he previously testified that the discovery had not been made available to him. Regardless, because he had accepted as true for purposes of his evaluation the allegations contained in the probable cause affidavit, "this [did] not change or alter [his] opinions as testified to on January 17, 2025."

DISTRICT COURT'S ORDER DENYING TRANSFER

The district court entered an order on February 10, 2025, denying the transfer. The court set forth the underlying facts as follows:

> In the late hours of August 12, 2024/early hours of August 13, 2024, [Wilson] is alleged to be with five other individuals, aged 11 to 17 years of age, and approached Mursal Jama as he was leaving his apartment near 93rd and Cady Streets for work. Mr. Jama is alleged to have been shot to death by one of the six individuals. About an hour earlier, it is alleged that these same six individuals confronted two individuals in a convenience store parking lot near 120th and Dodge Streets at multiple gunpoint to try and take their car. The car theft was unsuccessful but it is alleged these six individuals did take a wallet and some money. Video of the convenience store event appears to show [Wilson] to have a handgun.
>
> In alleged related incidents, [Wilson] and others are believed to have stolen a vehicle in the Kansas City, Missouri area, driving to a gun store in Nebraska City, Nebraska[,] in the early morning hours of August 13, 2024[,] and stealing nine firearms. An hour or so after the murder of Mr. Jama, [Wilson] and the other five codefendants

- 6 -

returned to the Nebraska City, Nebraska[,] gun store but were noticed by local police giving rise to a multi-county, and multi-jurisdictional law enforcement car chase with speeds exceeding 100 mph before [Wilson] and his codefendant's [sic] apprehension in and around the 50th and Q streets area in Omaha.

The district court noted that Dr. Newring's report "provides a comprehensive review of [Wilson's] interactions with the Juvenile Court." His "contacts have been numerous and the results largely unsuccessful." The court pointed out that as recently as 6 days prior to the above-noted incidents, Wilson "absconded from his placement at Child Saving Institute (CSI)." Further, a probation officer testified to Wilson having gang affiliations and a "'run' history" from juvenile court proceedings. It noted that Wilson "has a significant record of 'running' or 'absconding' from facilities" and this makes it difficult to place Wilson, including at the YRTC because it is "not a fully secure facility."

The district court acknowledged Dr. Newring's observations that Wilson had an IQ of between 75 and 83, read at the third grade level, and that although the charges involved violence, there was no evidence of premeditation to kill someone but only to steal a vehicle.

The district court found there were few options available for Wilson due to his "tendency to abscond." The offenses were "extremely violent" and involved the use of gun. The ages of others involved were 11 to 17. Wilson had numerous unsuccessful contacts with the juvenile court. The court stated, "Obviously it is in [Wilson's] best interest that he be transferred to the Juvenile Court for further intervention rather than be tried, and perhaps convicted, in adult court of, inter alia, murder." (Underscoring in original.) The court noted that "[g]iven the nature of [Wilson's] previous noncompliance with the Juvenile Court interventions, the violence here," and the "relatively short term the Juvenile Court would have to act before [Wilson] turns 19 years of age," it is in the "interest of public safety that he be subject to supervision beyond the age of 19." The court also noted Wilson's gang affiliations and determined there was "little" or no information on the remaining factors.

In overruling the motion to transfer, the district court summarized as follows:

> Considering all of the circumstances, including but not limited to [Wilson's] mental health, his home and school activities, prior contacts with law enforcement and the Juvenile Court, his emotional attitude, response to prior treatment in the Juvenile Court, the limited amount of time for Juvenile Court to treat [Wilson] and [Wilson's] apparent desire to live and act on his own terms, it is the Court's determination that it is in the best interests of [Wilson] and the security of the public that [Wilson] continue in custody of or under the supervision of the Court for a period extending beyond his majority.

Wilson timely appealed.

ASSIGNMENTS OF ERROR

Wilson assigns as error that the district court abused its discretion by (1) failing to make sufficient findings under Neb. Rev. Stat. § 43-276 (Cum. Supp. 2024) and (2) finding a sound basis existed to retain the matter in the district court.

STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against such juveniles may be initiated either in juvenile court or in the county or district court. Wilson, age 16 at the time of the offenses, was charged with multiple felonies: Class IA (first degree murder), Class IC (use of deadly weapon to commit felony, three counts), Class II (robbery, two counts), and Class IV (unlawful possession of firearm by prohibited juvenile offender, first offense). The State elected to file charges against Wilson in the district court.

When considering whether to transfer a case, Neb. Rev. Stat. § 29-1816(3)(a) (Cum. Supp. 2024) requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at a juvenile transfer hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). "[F]actors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case

should be transferred." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. See *id.*

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id.* "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "[T]he burden of proving a sound basis for retention lies with the State." *Id.* at 557, 990 N.W.2d at 926.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt, supra*.

## NO ABUSE OF DISCRETION

Wilson contends that the district court "failed to delineate with specificity the sufficient findings that satisfied the State's burden of proof." Brief for appellant at 15. He acknowledges that the district court referred to every statutory factor, but he contends that "the minimal findings the court made were generic and at times confusing." *Id*. Wilson then addresses each of the statutory factors in § 43-276(1) to explain why the court abused its discretion in finding a sound basis existed to retain the case. He suggests that the "juvenile court has not yet explored the type of individualized treatment that [Wilson] requires to even have a chance at success." Brief for appellant at 18. Although Wilson acknowledges his "run history" and that the options for him would "likely be very limited," he nevertheless contends that an "individually tailored plan" might make him more amenable to juvenile court services. *Id*. at 18-19.

Wilson claims the offense involves his "entanglement with negative peers." *Id*. at 20. He suggests that his young age "bodes well for him as it relates to the time and opportunity he has available to him to alter the trajectory of his future." *Id*. at 21. He points out that his "misbehavior began following the unexpected death of his mother." *Id*. at 22. He then "fell into a harmful peer group." *Id*. Given his "significant deficiency in intellectual functioning," Wilson suggests that a transfer would allow him to "begin receiving and participating in a level of services that appropriately suits his level of functioning, understanding, and maturity." *Id*. Wilson also argues that he denied gang involvement in his predisposition investigation report but did admit he was friends with gang members and was treated as if he was a gang member by opposing gangs. He suggests that it is "reasonable to believe that a juvenile who is friends with individuals who are in a gang could be in rational fear[] of other gangs." *Id*. at 26. He contends, "Guilt by association is not a sound basis for concluding that [Wilson] is a criminal street gang member." *Id*.

The State counters that the district court did not abuse its discretion; it considered all statutory factors, and its conclusion is supported by the evidence.

While Wilson has set forth several reasonable arguments in support of transferring his case to the juvenile court, our review is constrained by an abuse of discretion standard of review. The findings made by the district court in its order denying Wilson's motion to transfer to juvenile court are sufficient to overcome an abuse of discretion review. See *State v. Jeremiah T.*, 319 Neb.

133, ___ N.W.3d ___ (2025) (reversing Nebraska Court of Appeals decision finding abuse of discretion by district court in denying transfer; reiterating that when trial court's basis for retaining jurisdiction over juvenile is supported by appropriate evidence, it cannot be said that court abused its discretion in refusing to transfer case to juvenile court). "Abuse of discretion is a highly deferential standard of review." *Id*. at 151, ___ N.W.3d at ___. "[A]n appellate court's review is limited to determining whether the trial court's reasons and rulings are clearly untenable," which means "'incapable of being defended.'" *Id*. at 152, ___ N.W.3d at ___ (quoting Webster's Encyclopedic Unabridged Dictionary of the English Language 1567 (1989)).

Although the Nebraska Supreme Court acknowledges the "Legislature's goal of favoring juvenile courts as forums for criminal offenses committed by minor children," *In re Interest of Steven S.*, 299 Neb. 447, 455, 908 N.W.2d 391, 397 (2018), it nevertheless instructs that "when reviewing a trial court's ruling on a transfer motion, an appellate court's function is not to review the record de novo to determine whether we think the case should be transferred." *State v. Jeremiah T.*, 319 Neb. at 152, ___ N.W.3d at ___. A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion only. See *id*. Notably, however, a de novo review is incorporated into an appellate court's review when there is a transfer from juvenile court to adult criminal court. See *In re Interest of Steven S.*, 299 Neb at 455, 908 N.W.2d at 396 (deciding as matter of first impression that transfer requests from juvenile court to adult court should not "employ the pure abuse of discretion standard," but instead appellate courts should review juvenile court's decision de novo on record for abuse of discretion).

Regardless of what level of appellate review may be applicable to a juvenile's case, the most impactful decision occurs in the trial court. And as this court has previously observed, a "trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id*.

Applying the abuse of discretion standard of review to the present case, we cannot say the district court's rulings are clearly untenable or are "incapable of being defended." The State's key witness, Briggs, testified that there were no available options for placement of Wilson due to the nature of the current charges, as well as his past lack of cooperation with juvenile services and his record of absconding. It was her opinion that the YRTC "would most likely be the only option we would have." But Briggs expressed concern that the YRTC could only keep Wilson for 6 to 9 months, after which, he would be returned to the community. Although Dr. Newring testified that Wilson had not been fully offered the juvenile services necessary for someone with his deficit in cognitive abilities and that he was not aware of a program in the adult correctional system "designed for somebody with [Wilson's] intellectual and academic abilities," the district court was not bound by his opinion. See *State v. Jeremiah T., supra* (district court not required to take opinions of experts as binding upon it; expert witnesses not treated any differently in factfinding process than that of witnesses generally when it comes to determining weight and credibility of testimony).

The district court considered the evidence related to Wilson's IQ and reading level but weighed more heavily Wilson's noncompliance with previous juvenile court interventions, the violence involved in the present case, and the "relatively short term" the juvenile court would "have to act" before Wilson turned 19 years of age. The court concluded that the "interest of public safety" required that Wilson be supervised beyond the age of 19. Because we cannot say the trial court's reasons and rulings are clearly untenable, we cannot say it abused its discretion.

## CONCLUSION

Finding no abuse of discretion, we affirm the district court's order denying Wilson's motion to transfer to the juvenile court.

AFFIRMED.